UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

IN DEFENSE OF ANIMALS;                    No. 2:10-cv-01852-MCE-DAD
DREAMCATCHER WILD HORSE AND
BURRO SANCTUARY; BARBARA
CLARKE; CHAD HANSON;
LINDA HAY,

   Plaintiffs,

 v.                                  <u>MEMORANDUM AND ORDER</u>

UNITED STATES DEPARTMENT OF
THE INTERIOR; BUREAU OF LAND
MANAGEMENT; KEN SALAZAR,
Secretary of the United States
Department of the Interior;
ROBERT ABBEY, Direcot of the
Bureau of Land Management; KEN
COLLUM, Acting Field Manager
of Eagle Lake Field Office,

   Defendants.

       ----oo0oo----

  Plaintiffs in this action, which consist of an animal rights

group along with a wild horse and burro sanctuary and other

concerned individuals, seek though this Motion to halt a planned

"gather", or round-up, of wild horses and burros scheduled to

commence on August 9, 2010 at the Twin Peaks Herd Management Area

("HMA").

1

Plaintiffs argue that the planned gather runs counter to the congressional mandate for preserving wild horses and burros as set forth in Wild Free-Roaming Horses and Burros Act, 16 U.S.C. § 1331, et seq. ("Act").  Plaintiffs also contend that the provisions of the National Environmental Policy Act ("NEPA") have been violated because the Environmental Assessment ("EA") for the gather fails to adequately analyze a reasonable range of alternatives, fails to ensure scientific integrity and dissenting opinion, and consequently fails to take the requisite "hard look" at the proposed action for NEPA purposes.  Instead, according to Plaintiffs, because of the cumulative impacts occasioned by the gather and its unprecedented scope, at a minimum the Court should require that a comprehensive Environmental Impact Statement ("EIS") be prepared before the gather moves forward.

While Plaintiffs' Motion is styled as a request for both a temporary restraining order and a preliminary injunction, because the Motion has been fully briefed and since extensive oral argument was heard on the matter at the time of the August 5, 2010 hearing, the Court believes it is appropriate to consider the matter as a preliminary injunction and analyze the instant Motion under that standard.[1]

///

[1] Plaintiffs' counsel contended at oral argument that a temporary restraining order could be based upon a showing of immediate and irreparable harm to the Plaintiffs, alone, citing Federal Rule of Civil Procedure 65(b).  Rule 65(b), however, by its terms applies only to the issuance of a temporary restraining order without notice, and before the adverse party can be heard in opposition.  That is not the situation here, where the case has been fully briefed and argued on a schedule stipulated to by the parties.

At the close of the August 5, 2010 hearing, the Court denied Plaintiffs' request for injunctive relief from the bench.   This Memorandum and Order, as promised following the hearing, reiterates that denial in further detail.

**BACKGROUND**

The Twin Peaks HMA comprises some 789,852 acres of public and private lands on either side of the border between California and Nevada.   Approximately 55 miles long from north to south, and 35 miles wide, slightly more than half of the HMA is located within Lassen County, California.   The remainder is in Washoe County, Nevada.   The Bureau of Land Management ("BLM") designated the Twin Peaks HMA as suitable for the long-term maintenance of wild horses and burros in 1981.   The Cal Neva Management Framework Plan established a multiple use balance between livestock, wild horses, and wildlife in 1982.

The population of wild horses and burros within the HMA has increased sharply since the first aerial population inventory was conducted in 1973.   At that time, 835 horses and 104 burros were recorded.   By 1977, the population was estimated to be at approximately 3,000 horses.   Because wild horses have few natural predators and are a long-lived species, and since documented foal survival rates exceed 95 percent, their population levels rise quickly.   Even though nine gathers within the Twin Peaks HMA have taken place since 1998, the estimated horse population has nonetheless almost doubled since 2004.   During the same period, burro numbers have risen from 74 to more than 280 animals.

3

1    A direct count aerial population inventory taken in
2    September of 2008 revealed some 1,599 horses and 210 burros.  At
3    the time the EA at issue in these proceedings was prepared in
4    2010, the current population was estimated to be 2,303 horses and
5    282 burros, based on a 20 percent horse foal crop per year and a
6    16 percent burro foal yield.  Since the EA was prepared, and in
7    preparation for the anticipated gather of excess horses and
8    burros to begin on August 9, the BLM conducted another aerial
9    population inventory on July 26, 2010.  That inventory yielded a
10   count of 2,236 wild horses and 205 burros, numbers slightly less,
11   but not appreciably lower, than the projected figures,
12   particularly with respect to the horses.

13   The appropriate management level ("AML") for the Twin Peaks
14   HMA has been established as a population range of between 448 and
15   758 wild horses and between 72 and 116 burros.  The AMLs are
16   designed to ensure a thriving natural ecological balance
17   consistent with multiple use objectives for the HMA.  The BLM
18   strives to remove animals from the HMA population if numbers
19   exceed the established AML range.  Based on the above numbers,
20   the EA estimated that there were some 1,855 horses in excess of
21   the AML lower limit, and 210 excess wild burros.  Compounding the
22   situation, according to the BLM, is the fact that wild horses
23   exceed the forage allocated to their use by 3 to 5 times, since
24   they graze constantly throughout the year.  Livestock, on the
25   other hand, which are moved from place to place, average only
26   some 59 percent for cattle and 32 percent for sheep of their
27   allocated usage.
28   ///

While range conditions (both water sources and vegetation) still remain acceptable, the BLM believes that decreasing the numbers of horses and burros is essential to avoid unduly depleting available resources in the long run, especially since their numbers increase so rapidly if left unchecked.

In order to trim current horse and burro populations to appropriate levels, the BLM has proposed that an attempt be made to gather the entire population of horses and burros within the HMA.  Since previous gathers have typically rounded up only 80 to 90 percent of the animals, depending on the numbers actually retrieved, the EA estimates that about 180 horses will be released after the gather.  The released horses would have a sex ration of 60:40 studs to mares in order to help curb future population increases, in addition, some or all of the released mares (depending on the capture rates) would receive fertility control treatments (an immunocontraceptive known as Porcine Zona Pellucida, or PZP) designed to reduce their fecundity over the following two-year period.  The BLM's goal, consistent with the low range of the established ALMs, is to ultimately leave approximately 450 horses and 72 burros in the HMA.

The proposed gather, originally set to commence on August 9, 2010, is expected to take approximately 45 to 60 days to complete.  A helicopter drive method of capture is envisioned, whereby low flying helicopters steer the animals into capture sites, where they will be kept for up to one hour before being transported to temporary holding facilities.  Some roping from horseback is also expected.

///

According to the EA, the gather would proceed at a slow pace, with animals moving at either a walk or slow trot.[2]  Depending on temperature conditions, if heat stress is deemed to be a risk factor, gather operations would be conducted during the cooler parts of the day.  Electrolytes would be added to the drinking water in holding areas in order to combat dehydration, and the horses would be provided "good quality" hay.

Once gathered, the horses would be segregated so that any removed animals would be younger, and hence more adoptable in the long run.  Sick or disabled horses would be euthanized, and horses selected for release back on the range would be evaluated for sex and other desired herd characteristics like body condition class, color, size and disposition.

Ultimately, the excess animals will be transferred to BLM-managed holding facilities in the Midwest, from which adoption may occur.  By all indications, those storage facilities are spacious with ample room for the animals.  They are located on private land.

Plaintiffs object to the proposed gather as both inhumane and in direct contravention of the Act.  They claim that the EA does not properly identify and categorize excess animals prior to capture, and further allege that herding horses and burros during the summer August heat imposes an unacceptable strain on the animals.

///

///

---

[2] This is contrary to Plaintiffs' repeated description of the round-up as a "stampede".

6

They further contend that the BLM has not adequately shown that HMA resources are being overtaxed by the current population of horses to the extent that there are indeed excess animals.  In addition, Plaintiffs allege that the EA does not properly analyze the combined effect of so many animals being gathered, along with the impact that widespread contraception will have on the animals and their social characteristics.  By failing to adequately address those issues, Plaintiffs claim that the EA runs afoul of APA's mandate that a "hard look" be taken prior to any significant environmental action.  Absent that hard look, and given the claimed violations of the Act, Plaintiffs ask that the Court prevent the August 9, 2010 gather from proceeding.

**STANDARD**

The issuance of a preliminary injunctive relief is an extraordinary remedy, and Plaintiffs have the burden of proving the propriety of such a remedy by clear and convincing evidence. See Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Granny Goose Foods, Inc. v. Teamsters, 415 U.S. 423, 442 (1974).  Following the Supreme Court's decision in Winter v. Natural Resources Defense Council, 129 S. Ct. 365 (2008), the party requesting such relief must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Stormans, Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting Winter, 129 S. Ct. at 374.

Alternatively, under the so-called sliding scale approach, as long as the Plaintiffs demonstrate the requisite likelihood of irreparable harm and show that an injunction is in the public interest, a preliminary injunction can still issue so long as serious questions going to the merits are raised and the balance of hardships tips sharply in Plaintiffs' favor.   Alliance for Wild Rockies v. Cottrell, 2010 WL 2926463 at *4-7 (9th Cir. July 28, 2010) (finding that sliding scale test for issuance of preliminary injunctive relief remains viable after Winter).

**ANALYSIS**

**A.    Likelihood of Success on the Merits**

      **1.    Violations of the Act**

In enacting the Wild Free-Roaming Horses and Burros Act, Congress found that wild horses, as "living symbols of the historic and pioneer spirit of the West", were to be "protected from capture, branding, harassment or death", and as such were to be considered an "integral part" of public lands in areas where they were presently found.  16 U.S.C. § 1331.  The BLM, as designate of the Secretary of Interior, is directed to accomplish this by maintaining "specific ranges on public lands as sanctuaries for their protection and preservation."  Id. at § 1333(a).  In managing such HMAs, the BLM must "maintain a current inventory of wild-free roaming horses and burros on given areas of the public lands."  Id. at § 1333(b).  As Congress explained,

///

8

> "The purpose of such inventory shall be to: make
> determinations as to whether and where an
> overpopulation exists and whether action should be
> taken to remove excess animals; determine appropriate
> management levels of free-roaming horses and burros on
> these areas of the public lands; and determine whether
> appropriate management levels should be achieved by the
> removal or destruction of excess animals, or other
> options (such as sterilization, or natural controls on
> population)."

Id.

In managing HMAs, Congress went on to provide that "all management activities shall be at the minimal feasible level..." Id. at § 1333(a). Despite that admonition, the Act goes on to unequivocally provide that if the current population inventory for an HMA reveals that overpopulation exists, and if the BLM determines that "action is necessary to remove excess animals", it "shall immediately remove excess animals from the range so as to achieve appropriate management levels." Id. at § 1333(b)(2).

In removing excess animals, the Act proceeds to prescribe an order in which animals should be removed, starting with old, sick or lame animals (which should be destroyed in the most humane manner possible), then proceeding to adoptable horses and burros which can be removed for "private maintenance and care". Id. at § 1333(b)(2)(A-B). Although the terms of the Act actually provide that excess animals for which an adoption demand does not exist should be "destroyed in the most humane and cost efficient manner possible", in fact Congress has never appropriated funds for extermination, as opposed to ongoing maintenance, of excess horses even if not adopted. See Defs.' Opp., 27:18-23.

///

///

1    Plaintiffs initially argue that BLM's proposed gather

2   violates the Act because the animals are not removed according to

3   the priority established by § 1333(b).  In attempting to round up

4   all horses and burros, according to Plaintiffs, BLM ignores the

5   statutory mandate that old, sick and lame animals be eliminated

6   first before determining if the number of remaining healthy

7   animals exceeds viable limits.

8    Despite these arguments, however, an agency like BLM has

9   considerable discretion on how to carry out the directives of the

10  Act.  Am. Horse Prot. Ass'n v. Watt, 694 F. 2d 1310, 1318 (D.C.

11  Cir. 1982); Am. Horse Prot. Ass'n v. Frizzell, 403 F. Supp. 1206,

12  1217 (D. Nev. 1975) (denying preliminary injunction request and

13  allowing wild horse gather to proceed after noting that BLM must

14  be afforded a "high degree of discretionary authority" in

15  managing herds).  Culling disabled animals from a more

16  comprehensively captured group of horses and burros is a method

17  falling within BLM's discretion.  Indeed, it is difficult to

18  imagine from a pragmatic viewpoint how the vetting process could

19  proceed on the range, as Plaintiffs advocate, rather than through

20  some capture process.  In its Defense of Animals v. Salazar

21  opinion, the District of Columbia Court of Appeals rejected a

22  similar argument, stating as follows:

23         "The plaintiffs' interpretation of the Wild Horse Act
           is also unpersuasive as a matter of logic.  Under the
24         plaintiffs' reading, no healthy horse may be captured
           before all old and infirm horses are destroyed.  This
25         interpretation creates an impossible Catch-22 for the
           agency: To evaluate the age and health of a horse, a
26         veterinarian must presumably be close to it for a
           significant period of time.  A wild horse is unlikely
27         to submit to such an inspection voluntarily; it would
           have to be restrained or, more likely, confined– in
28         other words, captured.

                                    10

1        But if, as the plaintiffs contend, the Bureau cannot
capture a healthy horse before euthanizing all
2        unhealthy ones, and cannot determine whether a horse is
healthy or unhealthy without capturing it, the agency
3        cannot begin the removal process, despite its statutory
mandate to do so.  A statute should not be construed to
4        produce absurd results. (Citation omitted.)  As a
result, the Wild Horse Act cannot logically be read to
5        forbid the capture of healthy horses prior to the
euthanization of unhealthy  ones."

6

7   <u>In Defense of Animals v. Salazar</u>, 675 F. Supp. 2d 89, 97-98

8   (D.D.C. 2009).

9        Importantly, too, the <u>Salazar</u> case goes on to find that

10  rounding up the vast majority of a herd for sorting does not

11  "remove" all horses simultaneously from the range, since some of

12  the horses are ultimately returned to the wild.  <u>Id</u>. at 97.

13  Consequently, contrary to Plaintiffs' argument, "removal" does

14  not occur before a determination is made of what horses are in

15  fact "excess".  Consequently, the Act's mandate is not

16  contravened.

17       While Plaintiffs rely heavily on the decision in <u>Colorado</u>

18  <u>Wild Horse and Burro Coalition v. Salazar</u>, 639 F. Supp. 2d 87

19  (D.D.C. 2009), that case in inapposite since it involved removal

20  of all wild horses in the West Douglas Herd Area in Colorado, and

21  because the BLM in that case had not made an excess determination

22  due to an overpopulation of horses.  Here, on the other hand, the

23  BLM made a specific determination of just how many animals in the

24  Twin Rivers HMA are excess, based upon established "appropriate

25  management levels" ("AMLs") and other considerations in promoting

26  multiple uses of the federal lands in question.

27  ///

28  ///

With respect to what constitutes an appropriate AML, BLM officials are also afforded significant discretion with respect to the wild horse and burro populations they manage.  See 16 U.S.C. § 1333(b).  According to the BLM, the AMLs in question here have been developed over the course of many years[3] in order to not only maintain a thriving natural ecological balance on the range, as the Act mandates, but also to maintain that balance in the long run, as the Act just as clear requires.  See id.  The BLM has determined that even if some of the HMA's resources are not currently taxed by the existing horse and burros numbers, they soon will be given the animals' rapidly increasing populations.  The Bureau's determinations in that regard are entitled to deference.

While Plaintiffs also claim that horse and burro populations should be given priority within the HMA, and that a greater share of available resources (and presumably different AMLs) should be allocated to them as opposed to cattle or other livestock, that argument fails.  First, to the extent that Plaintiffs propose that the multi-use parameters for the HMA be changed, such a change cannot be made within the confines of this action.  Rangeland stewardship is established through periodically prepared resource management plans.  See 43 U.S.C. § 1712; 43 C.F.R. Part 1600.

///

---

[3] Applicable AMLs were established for the Twin Peaks HMA in 1998 pursuant to a research management plan resulting from an extensive administrative process.  The propriety of those ALMs has since been periodically revisited.  See EA, Ex. 2 to Zahedi Decl., pp. 10-11.

1  The resource management plan applicable to the Twin Rivers HMA
2  was last revised in 2008, after more than for years of public
3  input and analysis.  See Haug Decl., ¶ 24.  Any challenge to how
4  range use is allocated must be made pursuant to the Federal Land
5  Policy and Management Act, 43 U.S.C. § 1701, et seq., and not
6  through the Wild Free-Roaming Horses and Burros Act.

7       Plaintiffs' argument that the HMA must be managed
8  "principally" for wild horse and burro use is also unpersuasive.
9  16 U.S.C. § 1333(c), however, enacted in 1971, states only that
10 ranges should be "devoted principally but not necessarily
11 exclusively to horse and burro welfare in keeping with the
12 multiple-use management concept for the public lands."  Although
13 even this language does not mandate that only horse and burro
14 interests be considered, in 1978 Congress amended the act to make
15 it clear that BLM must strive for a balance that meets the needs
16 of all range users.  As the D.C. Circuit explained,

17       "The main thrust of the 1978 amendments is to cut back
         on the protection the Act affords wild horses, and to
18       reemphasize other uses of the natural resources wild
         horses consume.  The amendments introduce a definition
19       of 'excess' horses: horses are in 'excess' if they
         'must be removed from an area in order to preserve and
20       maintain a thriving natural ecological balance and
         multiple-use relationship in that area.'"
21

22 Am. Horse Prot. Ass'n Inc. v. Watt, 694 F.2d 1310, 1316 (D.C.
23 Cir. 1982) (citing 16 U.S.C. § 1332(f)).

24      The legislative history underlying the 1978 amendments
25 further illuminates Congress' intent:
26 ///
27 ///
28 ///

13

"The goal of wild horse and burro management, as with all range management programs, should be to maintain a thriving ecological balance between wild horse and burro populations, wildlife, livestock and vegetation, and to protect the range from the deterioration associated with overpopulation of wild horses and burros."

Conference Report 95-1737, October 6, 1978 to accompany H.R. 10587, Public Rangelands Improvement Act of 1978.  The Act should consequently not be viewed as requiring that the BLM increase the numbers of horses, or give wild horses priority over other users.  See Fallini v. Hodel, 725 F. Supp. 1113, 1118 (D. Nev. 1989) (holding that the Act does not give horses higher status than cattle on public lands).  Instead, the focus of the Act is rightly viewed as protecting wild horse herds as one component of multiple species, and many users, sharing a common environment.

Plaintiffs also point to the Act's mandate that the BLM's management of horses and burros be at a "minimal feasible level" in arguing that the gather proposed here be enjoined.  That language, however, taken from § 1333(a), must be read in conjunction with the equally clear directive that the Bureau adopt a multiple-use management program, as set forth in §1332(c).  As already noted above, horse populations in the HMA have increased dramatically in recent years, and has approximately doubled since 2004, despite numerous gathers.  Left unchecked, it appears the horse population could increase as much as 25 percent annually.  See Haug Decl., ¶¶ 34-35.  The BLM has already established that current populations within the HMA exceed appropriate management levels by more than five fold at the low range and by more than three times at the high end of the spectrum.

14

1  Left unchecked, the wild horse population would likely exceed

2  7,000 after ten years and could reach up to 19,624 horses.  EA at

3  86.  Given the clear statutory mandate that "excess" horses be

4  removed, the proposed gather does not run afoul of the

5  requirement that only "minimal" management be employed.

6  Moreover, given the burgeoning population, efforts to slow

7  reproduction (and the need to remove excess horses in the future)

8  through immunocontraceptives administered to released mares, and

9  through a skewed sex ratio of mares to stallions, is also within

10  the Act's purview given the circumstances of this case.  As the

11  BLM pointed out during oral argument, efforts to bring

12  populations down to sustainable levels now will in the long run

13  amount to less, not more, interference and more minimal

14  management activities for the animals.

15      Plaintiffs fare no better in arguing that the planned

16  storage and transport of wild horses to BLM long-term holding

17  facilities is illegal under the Act.  While 16 U.S.C. § 1339 does

18  prohibit BLM from relocating wild horses and burros "to areas of

19  the public lands where they do not presently exist", the Act is

20  silent with respect to private lands.  Since the BLM is also

21  barred by an appropriations statute from euthanizing healthy

22  excess horses (see EA, p. 91), relocation to private facilities

23  is necessary given the Act's mandate that excess horses be

24  removed.  Significantly, as the government points out, Congress

25  has repeatedly provided funding to BLM for the operation of

26  facilities to house excess animals on private lands.

27  ///

28  ///

15

As *amicus curiae* Safari International delineates on page 8 of their brief, those designated holding areas are in fact thousands of acres in size and would appear to afford ample room to the horses and burros in question.

In sum, for all the above reasons, the Court does not find that Plaintiffs are likely to prevail on the merits of their claims that the provisions of the Wild Free-Roaming Horses and Burros Act have been violated.

### 2.   NEPA Violations

In addition to arguing that the proposed gather violates the Wild Horses Act, Plaintiff also claims that the gather's underlying EA runs counter to the provisions of NEPA, since it failed to take the requisite "hard look" at the environmental impact of the action.  See Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21 (1976).  Not every action, however, requires a comprehensive EIS, however; rather, if the agency concludes that there will be no significant environmental impact on the basis of a less detailed EA, it can issue a Finding of No Significant Impact, as the BLM did here on the basis of the 158-page EA that was prepared.  The Court's review of the EA under NEPA should be limited to whether the BLM took a hard look at the environmental consequences of the gather; it must not substitute its own judgment for that of the agency.  See Okanogan Highlands Alliance v. Williams, 236 F.3d 468, 473 (9th Cir. 2000) (citing Kleppe, supra).

///

1    While Plaintiffs claim that the EA failed to consider

2  sufficient alternatives to its proposed gather plan, a review of

3  such alternatives is governed by a "rule of reason" commensurate

4  with the EA's statement of purpose and need.  See City of Carmel-

5  By-The-Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1156 (9th

6  Cir. 1997).  As set forth above, given the rapidly increasing

7  horse and wild burro population and the BLM's obligation to

8  consider other range users in addition to the horses and burros,

9  it appears clear that given the established ALM range for the

10  animals, wild horses and burros presently exceed recommended

11  levels by between three and five times.  While the agency did

12  eliminate serious consideration of options that did nothing to

13  decrease horse and burro population, since that corresponded

14  neither with their objective or the statutory mandate that excess

15  animals be removed, it did look seriously at four different

16  alternatives before settling on the proposed action.  Plaintiffs

17  have not demonstrated that they are likely to prevail on a NEPA

18  alternatives claim given these circumstances.

19    Plaintiffs also claim that the subject EA is lacking

20  scientifically and fails to adequately respond to dissenting

21  scientific opinion.  Examination of the lengthy EA, however,

22  indicates that all aspects of the proposed gather were carefully

23  considered.  While Plaintiffs take particular aim at the plan to

24  skew the sex ratio of released animals to 60 percent male, and

25  inject some mares with immunocontraceptives, those actions will

26  not apply to animals not gathered (typically a capture rate of

27  only about 80 percent is achieved).

28  ///

Moreover, the EA explains in detail why those measures were necessary to help curb further population increase.  The EA determined, for example, that the PZP contraception is completely reversible, meets BLM requirements for safety to mares and to the environment, and can be easily administered in the field.  EA, p. 93.  It also disclosed the impacts of the PZP contraceptive vaccine.  Id. at 92-93.  At least one district court has found that the PZP contraceptives in question are not so uncertain as to require an EIS.  Cloud Foundation v. Kempthorne, 2008 WL 2794741 at *9 (D. Mont. 2008).  According to the Declaration of Albert J. Kane, a Senior Staff Veterinarian for the United States Department of Agriculture who also serves as an adviser to the BLM's Wild Horse and Burro program on matters related to animal care, PZP treatments have been administered to free roaming wild horses since the 1990's, and since 2004, the BLM has safely administered over 2,700 doses of the vaccine in over 75 herd management areas, with no evidence of the treatment having any effect on population ecology.  Kane Decl., ¶ 28.  Moreover, in the scientific studies identified by Plaintiffs as questioning the safety of PZP, repeated administration of the vaccine appears to have been the issue.  That concern was underscored by Plaintiffs at oral argument.  Here, it appears that the animals on the Twin Peaks HMA have not in fact been inoculated previously.

/// 
/// 
/// 
///

1   Although Plaintiffs appear to contend that the BLM failed to

2   adequately respond to scientific studies that show the

3   contraceptives to be more effective during their limited (up to

4   two-year) period of efficacy (the BLM's scientists estimated up

5   to 80 perfect effectiveness, whereas Plaintiffs point to studies

6   suggesting that the effectiveness might be closer to 100

7   percent), the fact that the BLM chose to stand by its own

8   estimates after acknowledging the information provided by

9   Plaintiffs does not make the EA insufficient.  An agency has the

10  discretion to rely on the reasonable opinion of its own experts

11  (Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989)),

12  and agencies are accorded particular deference with respect to

13  scientific issues within their area of expertise.  See Sw. Ctr.

14  for Biological Diversity v. Bureau of Reclamation, 143 F.3d 515,

15  523 (9th Cir. 1998).  Because the EA has given a thorough and

16  reasoned explanation for its determinations, the expert analyses

17  contained therein are entitled to substantial weight.  See, e.g.,

18  Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233,

19  1244 (9th Cir. 2005).  While Plaintiffs argue that the BLM had to

20  respond explicitly and directly to the conflicting science they

21  identified, the authority Plaintiffs cite applies not to an EA

22  but instead to the more comprehensive EIS.[4]

23  ///

24  ///

25  _____

26  [4] While Plaintiffs argue that the obligation to respond to
    dissenting opinion in an EA is governed by 40 C.F.R. § 1502.9(b),

27  that section is directed to the preparation of EISs, rather than
    EAs.  The regulation governing environmental assessments, on the

28  other hand, contains no such explicit command that all dissenting
    opinion be discussed.  See 40 C.F.R. § 1508.9.

1    Moreover, while Plaintiff also claims that the EA's

2    population modeling and foal rates are also inaccurate in

3    predicting population growth, the fact that the July 26, 2010

4    aerial population inventory came as close to the estimates using

5    the disputed methodology as it did would appear to validate the

6    integrity of the BLM's projections in that regard.

7    Plaintiffs' claim that riparian impacts were not thoroughly

8    considered lacks merit as well.  The EA contains an extensive

9    discussion on the effects of wild horses and burros on riparian

10   and wetland sites and explains how the BLM determined that

11   certain of those impacts were attributable to wild horses and

12   burros rather than livestock.  See EA, pp. 57-65.

13   Finally, it must be emphasized that in an EA, an agency is

14   not required to include the same level of detail, and the same

15   depth of response, as for a full EIS.  See Cal. Trout v. FERC,

16   572 F.3d 1003, 1016 (9th Cir. 2009).  Under 40 C.F.R. 1508.9, an

17   EA is defined as a "concise public document....that serves to

18   [b]riefly provide sufficient evidence and analysis for

19   determining whether to prepare an environmental impact statement

20   of a finding of no significant impact."  An agency must go

21   farther and prepare a full EIS only "if substantial questions are

22   raised as to whether a project may cause significant degradation

23   of some human environmental factor.  LaFlamme v. FERC, 852 F.2d

24   389, 397 (9th Cir. 1988).

25   ///

26   ///

27   ///

28   ///

Here, following careful consideration of the impacts of the proposed action within a lengthy, 158-page EA, the BLM determined that an EIS was not necessary inasmuch as the requisite "significant impact" needed to trigger preparation of a full EIS was lacking.  That conclusion appears well-reasoned and entitled to deference by this Court.

**B.   Irreparable Injury**

Plaintiffs claim that the requisite irreparable injury is present here because horses will die in the course of the gather, and because, should the gather proceed, the reduced population of horses and burros will decrease their opportunities to view and appreciate the animals.  Plaintiffs further claim that their ability to study free-roaming animals in their natural habitat, and within their particular family bands, will be impacted by the gather.  Specifically, they point to their "specific and unique interest" in studying groups of individual living animals with their own "personalities, families, and histories."  Pls.' Reply, 19:25-28.

Plaintiffs' initial argument is premised on the fact that some horses died recently in the course of the recent Tuscarora Gather in Elko, Nevada.  The BLM has produced evidence, however, that the relatively high mortality rates in that gather were due to pre-gather drought conditions at the Ownhee HMA.  See Opp., p. 46.

///

///

1  The same drought conditions are not present in the Twin Peaks
2  HMA, a fact underscored both by pictures of robust looking horses
3  contained within the EA (and also submitted by Plaintiffs) as
4  well as photographs of apparently ample water sources within the
5  HMA.  Additionally, as outlined above, the EA provides that
6  certain measures to protect the animals be employed, including
7  gathering operations at less-than-stampede conditions during
8  period of lower temperatures (despite Plaintiffs' often lurid
9  predictions to the contrary).  Although it appears inevitable
10 that some horses will die as a result of the gather, it is
11 equally certain that wild horses will suffer if their population
12 is allowed to grow unchecked and food and water resources grow
13 scarce.

14     With respect to Plaintiffs' abilities to still observe the
15 horses and burros, the animals will still be present after the
16 gather.  The Court is unaware of any enforceable right to observe
17 a particular number of animals, and it is sheer speculation that
18 any particular individual or family unit will be affected.
19 Moreover, and in any event, past experience shows that horse and
20 burro populations will increase even if the gather proceeds.  At
21 the hearing, BLM estimated that even after the proposed gather,
22 the wild horse population of the Twin Peaks HMA is still
23 estimated to increase at approximately 18.5 percent annually
24 after only four years.
25 ///
26 ///
27 ///
28 ///

1   Under the circumstances, Plaintiffs have not shown a likely
2   threat of irreparable harm, as they must in order to qualify for
3   the extraordinary remedy of preliminary injunctive relief.

4

5   **C.  Balance of Hardships**

6

7   The BLM has shown, rather convincingly in the Court's
8   estimation, that currently ecological conditions, particularly
9   when coupled with multiple-use mandates, cannot sustain the
10  current population of horses and burros in the long run, which
11  will only continue to grow absent significant intervention.  As
12  the EA estimates, populations are likely to increase as much as
13  25 percent a year if no control measures are taken.  EA, p. 95.
14  This means, as the EA also points out, that wild horse population
15  in the Twin Peaks HMA would exceed 6,000 to 8,000 head within ten
16  years, based on application population increase estimates.  Id.
17  This is significantly in excess of the AML range for the horse
18  population, at between 448 and 758.  The BLM claims that it
19  cannot protect and maintain the thriving natural ecological
20  balance of the HMA in a multiple-use management plan involving
21  both other species and other use objectives (as it is obligated
22  to do under the Act) given the increases that will invariably
23  occur if current population levels go unaddressed.  The Act
24  envisions that intervention will be necessary to protect the
25  necessary balance; in fact, it goes so far as to authorize both
26  sterilization and euthanasia.  16 U.S.C. § 1333(b).
27  ///
28  ///

23

Given the breadth of the congressional directive in that regard, as well as the Act's admonition that the BLM both protect and maintain the rangeland, it makes no sense to contend that it cannot take action to curb horse and burro populations before conditions become drastic due to overpopulation.  Significantly, as the BLM informed the Court at oral argument, it estimates that a "crash" due to horse and burro population may occur by 2012 if nothing is done in the meantime.  In the long run, reducing herd fecundity reduces intervention that may be necessary in the future.

Furthermore, as the BLM also points out, if it is unable to proceed with the gather this year, it is unlikely that a gather can occur for some time because of the limited number of contractors who have the qualifications and expertise to conduct gathers safely and effectively, and because of booked schedules of those contractors.  <u>See</u> Defs.' Opp., 48-49.  In addition to the delay, the cost will increase as the number of animals which must be removed will invariably increase.

The hardships Plaintiffs have identified, on the other hand, consist of largely intangible factors difficult to even properly quantify.  Plaintiffs' alleged loss of relationships with particular horses and family groupings, as mentioned above, is little more than speculation.  Moreover, some disruption to the social fabric of the herd appears inevitable inasmuch as even Plaintiffs conceded, at oral argument, that some effort to reduce horse and burro numbers would be needed (Plaintiffs' disagreement went instead to the timing of the present gather given their contention that the EA, as prepared, runs afoul both of the Act and of NEPA).

1  Plaintiffs' argument that the gather precludes their ability to
2  observe and study truly wild horses that have never been subject
3  to confinement also appears to be lacking inasmuch as BLM's plan
4  anticipates that certain horses will never be captured during the
5  course of the proposed operation.  Finally, while the Court does
6  agree that a certain number of animals will perish during the
7  course of the round-up, as stated above it appears just as likely
8  that significant numbers and horses and burros will die if their
9  populations are allowed to increase to the point that food and
10 water sources are no longer adequate.  After weighing all these
11 factors, the Court believes the balance of hardships favors BLM.
12
13      **D.    Public Interest**
14
15      The Court believes the public interest is served in this
16 matter by the BLM's management of the Twin Peaks HMA in
17 accordance with federal law.  Under the applicable Wild Free-
18 Roaming Horses and Burros Act, as discussed above, the BLM is
19 required to "immediately" remove horses determined to be excess.
20 16 U.S.C. § 1333(b).  The conclusion that the proposed gather is
21 accordingly in the public interest, because the BLM has
22 established that the HMA is overpopulated, is underscored by the
23 decision in Salazar, supra.  In that case, the court found that
24 the public interest did not favor enjoining a gather where the
25 BLM was legally required, under the Act, to remove excess horses.
26 In Defense of Animals v. Salazar, 675 F. Supp. 2d at 98.  That
27 reasoning applies equally here, and the public interest weighs in
28 BLM's favor as well.

**CONCLUSION**

As set forth above, Plaintiffs have demonstrated neither a likelihood of success on the merits, or a likelihood of irreparable injury sufficient to justify the extraordinary remedy of a preliminary injunction.  In addition, the balance of hardships as well as the public interest appear to favor Defendants.  Because the Court concludes that none of those four factors favor the Plaintiffs, they have not satisfied their burden under Winter, supra, to qualify for preliminary injunctive relief.  Additionally, because the balance of hardships does not tip in Plaintiffs' favor at all, let alone strongly as the so-called sliding scale test requires, Plaintiffs cannot establish entitlement to an injunction under that alternative test, as recently reaffirmed by the Ninth Circuit in Alliance For Wild Rockies, supra.  Plaintiffs' Motion for Preliminary Injunction (Docket No. 10) is accordingly DENIED.[5]

Dated: August 9, 2010

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

---

[5] The Court notes that Defendants, as a preliminary matter, argue that Plaintiffs lack standing to contest the relocation of animals, on grounds that such relocation remains only speculative until after the gather was completed.  In the Court's opinion, however, both the gather (with respect to which Defendants do not contest standing) and the animals' subsequent relocation are so inextricably intertwined as to render impossible any meaningful distinction between the two activities.  Defendants' standing argument therefore lacks merit.