UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

IN DEFENSE OF ANIMALS;                   No. 2:10-cv-01852-MCE-DAD
DREAMCATCHER WILD HORSE AND
BURRO SANCTUARY; BARBARA
CLARKE; CHAD HANSON; LINDA HAY,

          Plaintiffs,

    v.                                       **MEMORANDUM AND ORDER**

UNITED STATES DEPARTMENT OF THE
INTERIOR; BUREAU OF LAND
MANAGEMENT; KEN SALAZAR,
Secretary of the United States
Department of the Interior;
ROBERT ABBEY, Director of the
Bureau of Land Management;
KEN COLLUM, Field Manager of
Eagle Lake Field Office,

          Defendants.


----oo0oo----


    Plaintiffs In Defense of Animals, Dreamcatcher Wild Horse
and Burro Sanctuary, Barbara Clarke, Chad Hanson and Linda Hay
("Plaintiffs") bring suit pursuant to 16 U.S.C. § 1331 <u>et seq.</u>
and 42 U.S.C. § 4321 <u>et seq</u>.  (ECF. No. 1.)

1

1   Plaintiffs allege Defendants United States Department of the

2   Interior, Bureau of Land Management, Ken Salazar, Robert Abbey,

3   and Ken Collum ("Defendants") have violated provisions of the

4   Wild and Free-Roaming Horses and Burros Act, National

5   Environmental Policy Act, and Administrative Procedures Act.

6   Plaintiffs are seeking injunctive and declaratory relief.

7   Defendants have filed a Motion to Dismiss the Complaint for lack

8   of standing and mootness pursuant to Federal Rule of Civil

9   Procedure Rule 12(b)(1).[1] (ECF. No. 68.)  For the reasons stated

10  below, Defendants' Motion is DENIED as to all claims.[2]

11

12                          **BACKGROUND**[3]

13

14       This action arises out of Defendants' roundup, gather and

15  removal ("roundup") of wild horses and burros from the Twin Peaks

16  Herd Management Area ("Twin Peaks HMA") in northeast California

17  and northwest Nevada.  The Twin Peaks HMA encompasses around

18  789,852 acres, and the United States Bureau of Land Management

19  ("BLM") estimated that before the roundup, a total of

20  approximately 2,300 wild horses and over 200 burros lived on the

21  Twin Peaks range  (Mot. to Dismiss at 6, 7.)

22  ///

23

24       [1]  All further references to "Rule" or "Rules" are to the
    Federal Rules of Civil Procedure unless otherwise noted.

25

26       [2] Because oral argument will not be of material assistance,
    the Court deemed this matter suitable for decision without oral
    argument.  E.D. Cal. Local Rule 230(g).

27

28       [3] The factual assertions in this section are based on the
    allegations in Plaintiffs' Complaint unless otherwise specified.

                                2

The roundup took place on September 19, 2010 and resulted in the gathering of 1,637 horses and 160 burros. (Sec. Decl. of Nancy Haug at ¶¶4-5.)  After the roundup, 58 horses and one burro were returned to the range and the remainder were transferred to corrals where they will be either housed in short-term holding facilities where they will be available for adoption, or transferred to long-term pastures on private lands.  (Id. at 7, 9, 10-11.)

A.   Statutory Framework

1.   Wild Free-Roaming Horses and Burros Act

The roundup occurred pursuant to the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. § 1331 et seq. ("Wild Horses Act"), which directs the Secretary of the Interior to manage all wild free-roaming horses and burros on federal lands to maintain a thriving and natural ecological balance.  16 U.S.C. § 1331(a). Further, 16 U.S.C. § 1331(b) directs the Secretary to determine when an overpopulation exists, and to restore the appropriate management levels ("AML") by removal or destruction of the excess animals.

While the Secretary is granted significant discretion in maintaining the AML for each HMA, Congress has placed several restrictions on methodology that may be used.  In making determinations of overpopulation, the Secretary must first consult several government agencies enumerated in the statute and others to be determined by the National Academy of Sciences. 16 U.S.C. § 1333(b)(1).

Once an overpopulation has been determined, and action is to be taken, the Secretary is given specific procedures in 16 U.S.C. § 1333(b)(2)-(e) to follow in managing the animals.  For example, the Secretary must use the most humane methods possible to destroy the old, sick, lame, or additional excess animals that cannot be adopted. 16 U.S.C. § 1333(b)(2)(A)-(C).  All actions must be taken in the order and priority described in 16 U.S.C. § 1333(b)(2) until all excess animals are removed.  Additionally, 16 U.S.C. § 1339 expressly states that it does not authorize the Secretary to relocate wild horses or burros to areas of public lands where they do not presently exist.

The underlying purpose of the Wild Horse Act is to protect wild horses and burros from capture, branding, harassment or death.  16 U.S.C. § 1331.  The Code of Federal Regulations states that the Secretary is to manage wild horses and burros with the "goal of maintaining free-roaming behavior."  43 CFR 4700.0-6(c).  Further, management of wild horses and burros shall be at the minimum level necessary to attain objectives and shall be "undertaken with the objective of limiting the animals' distribution to herd areas."  43 C.F.R. § 4710.4.

## 2.   National Environmental Policy Act

The National Environmental Policy Act, 42 U.S.C. § 4321 et seq. ("NEPA") was enacted with the purpose of promoting efforts to prevent or eliminate damage to the environment, to "stimulate health and welfare of man," and to enrich the understanding of natural resources important to this nation.

NEPA is a recognition of the fact that nearly all federal activities impact the environment in some way and mandates that all government agencies consider the effects of their actions on the quality of the environment.  The affected aspects of the environment to be considered includes ecological, aesthetic, historic, cultural, economic, social, and health.  All direct, indirect or cumulative effects on the environment must be analyzed.  40 C.F.R. 1508.8

Before an agency takes any action, it must define the purpose and need of the proposed action, and look at various options for achieving that purpose and the effects of each option on the human environment.  42 U.S.C. § 4332.  An agency must also consider comments and concerns raised by interested parties and make a justifiable and fully explained decision.  Id.  In essence, NEPA only requires that agencies make a justifiable and fully explained decision after a thorough investigation of any environmental impact.

To fulfill NEPA's purposes, an agency may prepare an Environmental Assessment ("EA") to determine whether its planned action will have a significant environmental impact.  (Def.s' Mot. to Dismiss at 5.)  Where no significant environmental impact is found, the agency may issue a Finding of No Significant Impact.  Where an environmental impact is anticipated from the results of the EA, NEPA will require the agency to prepare an Environmental Impact Statement ("EIS") before proceeding.  Id.

///

///

///

Other factors besides anticipated environmental impact that trigger the need to prepare an EIS include actions that would set a precedent, cause unknown risks, implement a future program that has not yet been analyzed and controversial actions.

**B.   Plaintiff's Suit**

BLM routinely conducts population inventories of wild horses in the Twin Peaks HMA pursuant to the Wild Horse Act to determine whether action is needed to maintain the AML for wild horses and burros. (Def.s' Mot to Dismiss at 6.)  In September, 2008, BLM conducted a population inventory and determined that Twin Peaks exceeded its ALM by approximately 1,800 wild horses and 200 burros. Id.  On July 8, 2010, BLM issued an EA, a Finding of No Significant Impact, and Decision Record constituting its final decision to conduct a roundup of the wild horses and burros to bring the population back down to its AML.  Id. As of the most recent evaluation in 2001, the AML range for the Twin Peaks HMA is 448-758 wild horses and 72-116 burros.  Id.  Having counted 2,236 wild horses and 205 burros as of July 26, 2010, BLM determined that, if left alone, the population ultimately would become unsustainable and crash leaving behind seriously degraded soil, vegetation, water sources, and wildlife habitat.  Id. at 7. Given these statistics, BLM proceeded with its planned roundup under the authority of the Wild Horse Act.

///

///

///

1    The roundup at issue took place over the span of six days.
2  (Decl. of Rachel Fazio, Ex. A at 2.)   The roundup was effected by
3  use of a helicopter, which, with both its physical presence and
4  loud acoustics, would scare the wild horses and burros and drive
5  them in the direction of the trap so that they could be gathered.
6  Id. at 4.   According to Plaintiffs, BLM captures and releases
7  these animals indiscriminately and does not track demographics
8  such as age and disability, or familial bands between the animals
9  unless a foal is nursing.   Id. at 6, 9.   Once captured,
10  approximately 180 horses were returned to the Twin Peaks to
11  effect a ratio of 60:40 studs to mares.   (Def.s' Mot. to Dismiss
12  at 8.)   The released mares received fertility control treatment,
13  with the remaining "excess" horses either adopted or transferred
14  to long-term pastures on private lands.   Id.   Defendants stated
15  in their EA that they intended to leave 448 wild horses and 72
16  burros on the Twin Peaks HMA after the proposed action was
17  completed.   Id.

18    According to the October 2008 Government Accountability
19  Office report on BLM, 1.2% of the horses removed from other HMAs
20  across the United States were euthanized or died during the
21  gather process.   In a recent roundup conducted in another HMA,
22  over 5% of the wild horses subjected to the roundup were killed
23  in the process.   In the Twin Peaks roundup at issue, fifteen
24  animals were killed out of the 1,799 rounded up, two of which
25  were euthanized, amounting to less than 1%.[4]

26

27    [4] Statistics retrieved from the Gather Reports on the Twin
    Peaks Wild Horse and Burro Roundup found at http://www.blm.gov/ca/
28  st/en/fo/eaglelake/wildhorseandburro/twinpeaksgather/gatreports.html

Plaintiffs explain that once wild horses realize they have been
trapped, they are known to attempt to jump the six-foot panels of
the corrals to escape, or run head long into the barriers
breaking their necks in the process.  Others are severely injured
and shot as a result.  Plaintiffs further maintain that wild
animals will suffer "capture myopathy," a negative reaction to
confinement which has been known to cause death in wild horses.
Plaintiffs allege that roundups ultimately lead to the inhumane
maiming and death of the young, old, sick and lame horses.
Plaintiffs further claim that scientific studies show serious
harm to wild horses from anti-fertility drugs given to mares
before release.  (Pl.s' Opp. to Mot. to Dismiss at 2.)

Plaintiffs allege that Defendants violated several
provisions of the Wild Horse Act and NEPA in the resulting
roundup.  These allegations include violations both in the
process used to effect the roundup, and the decision itself to
instigate a roundup.

Plaintiffs' individual claims are as follows: (1) violation
of 16 U.S.C. § 1333(b)(2), which prohibits BLM from capturing and
removing old, sick or lame horses, and instead culling them on
the range, and additionally permits only removal of excess
adoptable horses; (2) violations of §§ 1331 and 1339, which
prohibit BLM from relocating horses to public lands where horses
do not presently exist, and did not exist in 1971; (3) violations
of §§ 1333(b)(2) and 1339 for roundup of non-excess, non-
adoptable horses;

///

///

8

1    (4) violations of § 1333(a), which prohibits extensive

2    interference with wild herds without considering other options,

3    and that HMAs be "devoted principally" to the welfare of wild

4    herds; (5) violation of 42 U.S.C. § 4332, which requires an EIS

5    to be prepared where there exists the possibility of significant

6    environmental impact including uncertain or controversial

7    effects; (6) failure to consider all reasonable alternatives to

8    the roundup pursuant to 42 U.S.C. § 4332(E) and 40 C.F.R.

9    § 1502.14; (7) failure to ensure scientific accuracy and

10   integrity of NEPA documents pursuant to 40 C.F.R. § 1502.24, and

11   failure to adequately disclose environmental impacts pursuant to

12   40 C.F.R. § 1508.9; (8) failure to respond to dissenting

13   scientific opinion; (9) failure to consider impacts and effects

14   on the environment; and (10) failure to prepare an organized and

15   readily understandable EA.

16

17                              **STANDARD**

18

19        Under Article III of the United States Constitution, a

20   federal court can only adjudicate an actual live "case or

21   controversy," which requires a plaintiff to demonstrate standing,

22   Summers v. Earth Island Inst., 129 S. Ct. 1142, 1149-50 (2009)

23   and that the matter is not moot, Powell v. McCormack, 395 U.S.

24   486, 496 n.7 (1969).  In order to establish standing, the

25   plaintiff must demonstrate (1) an injury in fact, which is

26   defined as a concrete and particularized invasion of a legally

27   protected interest;

28   ///

1  (2) causation which is fairly traceable between the alleged

2  injury in fact and alleged conduct of the defendant; and

3  (3) redressability.  Sprint Communications Co., L.P. v. APCC

4  Serv.'s, Inc., 554 U.S. 269, 273-74 (2008).

5      A court does not have jurisdiction "to give opinions upon

6  moot questions or abstract propositions, or to declare principles

7  or rules of law which cannot affect the matter in issue in the

8  case before it."  Church of Scientology of CA v. U.S., 506 U.S.

9  9, 12 (1992).  A claim is moot if "...changes in the

10 circumstances that prevailed at the beginning of litigation have

11 forestalled any occasion for meaningful relief."  Gator.com Corp

12 v. L.L. Bean, Inc., 398 F.3d 1125, 1129 (9th Cir. 2005) (en

13 banc).  The focus of a mootness inquiry is whether there can be

14 any effective relief to remedy the alleged violations.  NW Envtl.

15 Defense Ctr. v. Gordon, 849 F.2d 1241, 1244-45 (9th Cir. 1988).

16 If any remedy could help alleviate the adverse effects of the

17 injury suffered by a plaintiff, the claim is not moot.  Tyler v.

18 Cuomo, 236 F.3d 1124, 1137 (9th Cir. 2000).

19     Where a claim is found to be moot, dismissal may still be

20 unwarranted where the claim falls within a recognized exception

21 to the mootness doctrine.  One exception lies where the defendant

22 has voluntarily ceased the initial portion of the challenged

23 activity prior to its completion, but the activity could resume

24 without judicial intervention.  County of Los Angeles v. Davis,

25 440 U.S. 625, 631 (1979).

26 ///

27 ///

28 ///

10

Another exception applies where the action is capable of repetition yet evades review; the duration of the action is too short to allow full litigation before it ceases, and there is a reasonable expectation that plaintiffs will be subjected to the action again. Greenpeace Action v. Franklin, 14 F.3d 1324, 1329 (9th Cir. 1993). Recurrence of the challenged activity must not be too remote or speculative. Super Tire Eng'g Co. v. McCorkle, 416 U.S. 115, 122-23 (1974).

**ANALYSIS**

**A.   Standing**

Plaintiffs bring four claims against Defendants for violations of the Wild Horse Act regarding both the manner of Defendants' roundup of the wild horses and burros on the Twin Peaks HMA, and the act itself. Defendants attack these four claims for lack of standing. Defendants group each of Plaintiffs' four claims implicating the Wild Horse Act into two basic categories. Defendants maintain that Claims One, Two, and Four essentially challenge the legality of the roundup, and Claim Three challenges the potential relocation of excess horses to long-term holding facilities. Defendants contend that Plaintiffs cannot demonstrate standing as to either set of claims.

///
///
///
///
///

11

In order to demonstrate standing Plaintiffs must "establish: (1) an injury in fact (i.e., a concrete and particularized invasion of a legally protected interest); (2) causation (i.e., a fairly trace[able] connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability...." Sprint Communications Co., 554 U.S. at 273-74 (internal citations omitted).  This test emanates from Article III, § 2 of the Constitution and "[t]he purpose of the case-or-controversy requirement is to limit the business of the federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process."  Id. (internal citations omitted).

### 1.   Standing to challenge legality of the gather

Defendants argue that Plaintiffs' claimed injury is merely an alleged personal sadness at the effects of Defendants' actions.  Plaintiffs claim that they have a legally protected right to view horses on the Twin Peaks range.  Defendants maintain that neither of these assertions is a legally protected right that would give rise to a viable claim.

Diminished "aesthetic and environmental well-being," however, is a well recognized cognizable injury for the purposes of standing.  Fund for Animals, Inc. v. Lujan, 962 F.2d 1391, 1396 (9th Cir. 1992) (citing Sierra Club v. Morton, 405 U.S. 727, 734 (1972)).

///

///

Plaintiffs need not establish the complete elimination of the
animals they seek to conserve in order to have a recognized
injury-in-fact in the lost ability to observe and enjoy those
animals.  Animal Legal Def. Fund, Inc. v. Glickman, 154 F.3d 426,
437 (D.C. Cir. 1998)

Plaintiffs state that their concrete and particularized
injury-in-fact stems from their diminished ability to interact
with, view and enjoy wild horses and burros on Twin Peaks.  In
Lujan, the court agreed that a diminished opportunity to view
northern bison herds in Yellowstone was sufficient to establish
plantiffs' standing in challenging the defendants' bison
management plan, a plan that would remove more than two-thirds of
the bison population.  962 F.2d at 1396.  Likewise, this Court is
persuaded that Plaintiffs have established a concrete and
particularized injury-in-fact for standing in their allegedly
diminished ability to interact with and view wild horses and
burros.

Defendants argue that even if these harms were deemed
cognizable, however, no injury can take place from the removal of
wild horses Defendant BLM has determined to be "excess," as the
Wild Horse Act in fact requires Defendant BLM to remove those
horses from the area.  In essence, Defendants maintain that
Plaintiffs may have a right to enjoy some wild horses and burros,
but have no right to view "excess" wild horses and burros.  Such
an argument begs the question.  Defendants assume as true the
very point of contention underlying Plaintiffs' Complaint: the
legality of Defendant BLM's decision that the wild horses removed
were in fact "excess."

13

1    Acceptance of this argument would require this Court to
2    adjudicate the factual basis for the instant action.  On a motion
3    to dismiss, a court may not decide questions of fact, but,
4    rather, must assume as true all allegations in Plaintiffs'
5    Complaint.

6         In defense of its argument, Defendants maintain that
7    Plaintiffs have not challenged Defendants' calculation for
8    determining the proper AML for Twin Peaks, and so Plaintiffs do
9    not disagree that levels above 758 horses are in excess.  Though
10   Plaintiffs do not specifically contend with Defendants'
11   established ALM for Twin Peaks, they do challenge other relevant
12   factors that deflate Defendants' standing argument.  Plaintiffs
13   attack as "profoundly flawed" the data on which Defendant BLM
14   based its determination that there were excess wild horses on
15   Twin Peaks. (Compl. at ¶ 5.)  Plaintiffs also contend that
16   Defendant BLM did not properly categorize the horses prior to the
17   roundup to determine whether they were all excess.  Id. at ¶ 51.
18   And finally, they allege that non-excess horses were rounded up
19   from the range, which, according to Defendants' argument,
20   Plaintiffs would have a right to view and enjoy.  Id. at ¶ 46,
21   48, and 95.

22        Further, were this Court to accept Defendants' proposition
23   that Plaintiffs have no right to view any "excess" wild horses,
24   no plaintiff would ever have standing to challenge Defendant
25   BLM's removal of "excess" horses, regardless of how flagrant the
26   violation in making that decision.  Defendants have provided no
27   authority for such a proposition.
28   ///

                                14

Plaintiffs have properly established a concrete and particularized injury-in-fact to challenge the legality of the gather.  Defendants' Motion to Dismiss the Complaint for lack of standing as to Claims One, Two, and Four is DENIED.

> **2.  Standing to challenge the potential relocation of excess horses to long-term holding facilities**

> **a.  Injury Fairly Traceable to Defendants' Actions**

Defendants contend that Plaintiffs' stated injury of diminished enjoyment of wild horses is not fairly traceable to the Defendants' placement of excess horses in long-term holding facilities.  Defendants claim that, assuming the animals were in fact lawfully removed from Twin Peaks, Plaintiffs are not injured by the fate of those excess horses after removal.  Whether the horses are relocated to a long-term holding facility, adopted, sold, or destroyed, Defendants maintain that the effect to Plaintiffs is the same.  Wherever the horses end up, Defendant BLM will not return them to Twin Peaks where Plaintiffs wish to view them.

Plaintiffs respond that the roundups would have been far more limited, and less animals removed from Twin Peaks in the first place, if Defendant BLM had abided by the statutory restrictions, which they allege prohibit use of long-term holding facilities.  Plaintiffs cite to 16 U.S.C. § 1333(b)(2), which establishes the scope permitted for Defendant BLM's roundup of the animals.

///

15

Where the need for a roundup is determined by the Secretary, such an action "shall be taken" in accordance with 16 U.S.C. § 1333(b)(2)(A)-(C).  This section states that the Secretary shall capture and remove only the number of excess animals for which "he determines an adoption demand exists by qualified individuals...."  16 U.S.C. § 1333(b)(2)(B).  Outside adoption, the only expressly permitted means by which Defendants may dispose of the excess animals under the Wild Horse Act is to have them destroyed or sold.  16 U.S.C. § 1333(b)(2), (e).  Thus, Plaintiffs argue, without use of long-term holding facilities, Defendants would not have removed more animals than they could have feasibly succeeded in placing for adoption.

In support of their argument, Defendants cite to a D.C. Circuit case where the court found no reason to believe that BLM would cease to remove excess horses if long-term holding was an impermissible option.  In Def. of Animals v. Salazar, 713 F. Supp. 2d 20, 28 (D.D.C. 2010).  The court in In Def. of Animals suggests that, rather than move them to long-term holding, BLM could "redouble its efforts" to effect more adoptions of the animals, and euthanize any remaining unadoptable horses.  Id. However, in the instant case, Defendants themselves acknowledge that the only animals which end up in long-term holding facilities are those that cannot be sold or adopted.  (Mot. to Dismiss at 16.)  They further note that Congress has prohibited destruction of horses under existing appropriations law.  Id.

///

///

///

Since the animals which will be sent to long-term holding facilities are those which cannot be adopted, sold, or destroyed, it stands to reason that Defendants would have removed fewer animals from Twin Peaks if long-term holding were not an option.

This Court need not decide at the motion to dismiss stage whether long-term holding is in fact prohibited under the Wild Horse Act.  Assuming, as this Court must, that Plaintiffs are correct in their allegation that long-term holding is statutorily prohibited, Plaintiffs have established the injury-in-fact and causation elements of standing.  The stated injury of diminished ability to enjoy the wild horses and burros is fairly traceable to Defendants' removal of those animals to long-term holding.

### b.   Redressability

Defendants contend that any cognizable injuries to Plaintiffs are not redressable because the Wild Horse Act does not permit Defendant BLM or this Court to reintroduce excess horses to an overpopulated range.  16 U.S.C. § 1333.  According to Defendants, the only possible way to comply with an order prohibiting use of long-term holding facilities is to return these excess horses back to Twin Peaks in contravention of the Wild Horse Act.  Plaintiffs respond by providing an alternative to returning horses to Twin Peaks.  Plaintiffs claim that they would be satisfied with relocation to public lands in the West as opposed to long-term holding facilities in Oklahoma or Kansas so that Plaintiffs can continue to view and enjoy these wild horses.
///

1    Plaintiffs cite to 16 U.S.C. § 1333(a), which authorizes

2  Defendant BLM to designate additional ranges on public lands as

3  sanctuaries for the protection and preservation of wild horses

4  and burros.  Plaintiffs argue that even if the animals cannot be

5  returned to Twin Peaks, at least they can still live in the West

6  as Defendant BLM has the authority and discretion to designate

7  additional ranges for horses and burros.  Defendants have not in

8  their reply brief denied possessing this authority to relocate

9  the horses to a newly designated range in the West.  Thus,

10  regardless of the likelihood of Defendant BLM taking such an

11  action, the Wild Horse Act does indeed provide an opportunity for

12  redress of Plaintiffs' claims.  This Court finds that all three

13  elements required to establish standing have been met for each of

14  Plaintiffs' four claims under the Wild Horse Act.  Defendants'

15  Motion to Dismiss Claim Three for lack of standing is DENIED.

16

17    **B.    Mootness**

18

19    Defendants challenge Plaintiffs' Complaint (except for the

20  allegations contained in Claim Two) as moot and, therefore, not

21  justiciable.  Defendants, therefore, contend that this Court

22  lacks jurisdiction to hear the matter.  They attack the Wild

23  Horse Act Claims and NEPA Claims separately, arguing the claims

24  are moot, and do not meet either of the two exceptions for

25  mootness.

26  ///

27  ///

28  ///

1     A matter is moot and must be dismissed for lack of
2   jurisdiction if an injury no longer exists or a change in
3   circumstances during the litigation deprives a court of the
4   ability to provide any meaningful or effective relief for the
5   alleged violation.  See Mills v. Green, 159 U.S. 651, 653 (1895).
6   "A case might become moot if subsequent events made it absolutely
7   clear that the allegedly wrongful behavior could not reasonably
8   be expected to recur." Friends of the Earth, Inc. v. Laidlaw
9   Envtl. Services (TOC), Inc., 528 U.S. 167, 189 (2000) (quoting
10  U.S. v. Concentrated Phosphate Export Assn., 393 U.S. 199, 203
11  (1968)).  The heavy burden of persua[ding]" the court that the
12  challenged conduct cannot reasonably be expected to start up
13  again lies with the party asserting mootness. Id.  The focus of a
14  mootness inquiry is whether there can be any effective relief to
15  remedy the alleged violations.  NW Envtl. Defense Ctr., 849 F.2d
16  at 1245.  If any remedy could help alleviate the adverse effects
17  of the injury suffered by a plaintiff, the claim is not moot.
18  Tyler, 236 F.3d at 1137.

19      Where a claim is found to be moot, dismissal may still be
20  unwarranted where the claim falls within a recognized exception
21  to the mootness doctrine.  One exception applies where the action
22  is capable of repetition yet evades review.  Honig v. Doe,
23  484 U.S. 305, 318-20 (1988).  To fall within this exception, the
24  controversy must meet two requirements: "(1) the challenged
25  action was in its duration too short to be fully litigated prior
26  to its cessation or expiration, and (2) there was a reasonable
27  expectation that the same complaining party would be subjected to
28  the same action again." Murphy v. Hunt, 455 U.S. 478, 482 (1982).

And finally, recurrence of the challenged activity must not be too remote or speculative.  <u>Super Tire Eng'q Co.</u>, 416 U.S. at 123.

### 1.   Wild Horses Act Violations

Defendants argue that Claims One, Three, and Four are moot because the roundup is completed and this Court can no longer provide the Plaintiffs with meaningful relief.  Defendants maintain that none of Plaintiffs' claims meet the requirements for an exception to mootness.  Plaintiffs, in response, refer to Defendant BLM's Decision and EA to demonstrate that several main components of the 2010 Gather Plan have yet to be completed, and that many of Plaintiffs' claims are therefore not moot.  Because the Gather Plan is not yet complete, Plaintiffs contend, effective relief for the alleged violations of the Wild Horse Act can still be granted.  Plaintiffs argue in the alternative that even should their claims be denied as moot, an exception to the mootness requirements shall exist.

Claim One alleges that the Wild Horse Act requires old, sick and lame horses to be culled on the range rather than captured, and prevents Defendants from removing non-excess and non-adoptable horses from the range.  16 U.S.C. § 1333(b)(2)(A) and (B).  Claim Three alleges that Defendants were not permitted to capture and roundup non-excess horses only to release them back on the range.  16 U.S.C. § 1333(b)(2).

///

///

Claim Four cites to violations of 16 U.S.C. § 1333(a) by
extensively interfering in management of the horses, using
inhumane methods of chasing the horses with helicopters, and for
not principally devoting herd management to the welfare of the
horses and burros.  Plaintiffs list several forms of possible
relief: return captured horses to the range or another range in
the West, enjoin the sterilization of horses, enjoin further
implementation of the 2010 Twin Peaks Gather Plan, reduce
livestock grazing, require completion of an EIS, require public
disclosure of hard data and methodologies, and issue declaratory
relief regarding legal requirements of Wild Horse Act.

Though the last day of the actual roundup and removal of
wild horses and burros took place on September 19, 2010,
Plaintiffs contend that Defendants have not yet completed all
actions for their 2010 Gather Plan and, therefore, relief may
still be granted.  Plaintiffs note, and Defendants concede, that
they have not yet adopted out all the animals in short-term
holding, and that the adoption schedule extends until September
2011.  Additionally, Defendants concede they have not yet shipped
the remaining animals to long-term holding facilities.

Though Defendants acknowledge that these two aspects of
their 2010 Gather Plan have in fact not been completed, they
argue that the matter is still moot because Plaintiffs "are not
experiencing an ongoing harm," and effective relief is no longer
available to them.  (Def.'s Reply in Supp. of Mot. to Dismiss
at 6.)  Defendants base their claim that Plaintiffs are not
experiencing an ongoing harm on their insistence that the roundup
of wild horses and burros is complete.

21

The asserted injury, as mentioned above, is Plaintiffs diminished ability to enjoy wild horses and burros on the Twin Peaks HMA. Because the wild horses and burros removed from the range have not been returned, this Court finds that Plaintiffs do in fact continue to suffer the lost enjoyment of those animals.  They have sufficiently claimed an ongoing injury.  Whether that injury can be granted adequate relief requires a separate analysis continued below.  This Court need not analyze all Plaintiffs' requested forms of relief as it is sufficient to have one available form of relief to withstand a mootness defense.

### a.   Claims One and Four

Defendants maintain that the Wild Horse Act at § 1333(b)(2) forbids them from reintroducing animals to an overpopulated range, and so relief cannot be granted in this form.  Defendants further assert that they cannot destroy the horses, as opposed to sending them to long-term holding facilities, because the Fiscal Year 2011 appropriations bill prohibits such an action.  Pub. L. No. 111/188, 123 Stat. 2904, 2907 (2009).  And finally, they assert that they have already completed the anti-fertility treatments of mares, and all gelding operations were completed by April 4, 2011.  As all possible options are foreclosed, Defendants contend that this Court is unable to grant any of the requested relief to effectively redress Plaintiffs' injury.

///

///

///

22

Defendants' assertion that the Wild Horse Act prevents the return of wild horses to an overpopulated range may be supported by a reading of the provision cited, but it is by no means explicitly stated as such.  Provision 16 U.S.C. § 1333(b)(2) only requires BLM to remove excess wild horses from the range, and is silent on the return of horses to the range.  Statutory interpretation where a provision is not explicit requires further analysis which this Court should avoid in the context of a motion to dismiss.

Assuming, as this Court must, that Plaintiffs' allegations are true, and that Defendants conducted the roundup in violation of the Wild Horse Act, this Court would have to determine whether Congressional intent behind the Act would support a return of animals to an overpopulated range under these circumstances. Further, as noted above, Plaintiffs have challenged Defendants' foundational determination that Twin Peaks was overpopulated and that the animals removed were in fact "excess."  As such, this Court finds that it could provide effective relief in the form of relocation of the animals to the West assuming Plaintiffs allegations are proven true.  Defendants' Motion to Dismiss Claims One and Four for mootness is DENIED.

## b.    Claim Three

Unlike the prior two claims, Claim Three cannot be given effective relief with a return of the horses to either Twin Peaks or any other place in the West.

///

Claim Three seeks redress for Defendants' removal of non-excess
and non-adoptable horses from the range, and their subsequent
return to the range in contravention of the Wild Horse Act.
Plaintiffs argue that this action violates §§ 1333(b)(2) and 1339
because non-excess, non-adoptable horses may not be rounded up,
and the action constitutes an illegal abuse of discretionary
management authority.  The claimed injury for this allegation is
unclear as it does not diminish Plaintiffs' ability to view and
enjoy wild horses.  Those horses have already been returned and
are currently back on the range.  Because Plaintiffs suffer no
ongoing injury, though they may have in the interim before the
horses were returned, no effective relief can be granted and
Claim Three is moot.

Plaintiffs have argued in the alternative that their claim
in this regard still falls within an established exception to the
mootness doctrine.  The relief Plaintiffs seek in a circumstance
where mootness applies is to prevent Defendants from committing
the alleged wrongful acts again.  A claim is capable of
repetition yet evading review if the challenged action was too
short in duration to be fully litigated prior to its cessation or
expiration, and there is a reasonable expectation that the same
plaintiff would be subjected to the same action.  Murphy,
455 U.S. at 482.  According to Defendants, wild horse and burro
roundups are generally limited in duration, and maintain that
there is no reasonable expectation that BLM will effect another
wild horse and burro gather in the same vein as the 2010 Twin
Peaks Gather Plan.
///

1  Defendants acknowledge that a future gather is possible at some

2  undetermined date, however they claim that the exact means and

3  methods are speculative and do not satisfy this exception.

4      Defendants cite to <u>Fund for Animals, Inc. v. BLM</u>, 460 F.3d

5  13, 22-23 (D.C. Cir. 2006), which stated that the "capable of

6  repetition yet evading review" exception cannot be applied to

7  subsequent wild horse and burro gathers because such gathers are

8  "highly fact-specific." <u>Fund for Animals, Inc.</u>, however, was

9  particularly unique in that BLM set out to achieve nationwide

10 AML; BLM presented the plan to Congress as a Presidential Budget

11 Initiative, and so individual field offices were acting pursuant

12 to a nationwide initiative. <u>Id.</u> at 16-17. The court in that

13 case had determined it was a unique enough situation that it was

14 very unlikely to recur stating, "If there are to be more roundups

15 in the future-itself an open question-it remains to be seen

16 whether they will be of the same magnitude as those which have

17 come before, and whether the same criteria are applied." <u>Id.</u> at

18 23. Because the roundup at issue in that case was a one-off

19 sweeping initiative to reduce herd rates nationwide, it was

20 indeed difficult to say that situation would recur.

21     Here, however, individual roundups for Twin Peaks are not

22 unique events; three gathers have occurred in the last five

23 years. (Decl. Nancy Zahedi, Ex. 1 at 5.) Further, as noted

24 above, herd levels at Twin Peaks are already above ALM for the

25 range. Defendants have expressly stated their stance that herd

26 numbers above ALM are excess, and, they maintain, the Wild Horse

27 Act requires them to remove those animals.

28 ///

1   Accordingly, it is certainly a reasonable expectation that the

2   same plaintiffs would be subjected to the same injury in the

3   future.  Defendants argue that future roundups would vary in

4   timing and circumstances, such as topography, types of horses

5   gathered, and nature of any harms, which are all unknowable at

6   this point.

7        This Court does not find Defendants' argument persuasive.

8   The "capable of repetition" exception to mootness was not

9   intended to be applied so rigidly.  The Supreme Court has

10  eschewed such rigidity in application of the mootness exception.

11  Fed. Election Comm'n v. Wisconsin Right To Life, Inc., 551 U.S.

12  449, 463 (2007).  In response to a defendant's insistence that a

13  future repeatable claim must share all characteristics with the

14  current claim in order to be capable of repetition, the Court

15  stated, "History repeats itself, but not at the level of

16  specificity demanded by the [defendant]."  Id.  The case or

17  controversy to be repeated need not be factually identical to the

18  last detail, but instead considered in terms of the legal

19  questions it presents and the identifying factors that are

20  essential to Plaintiffs' theory of their claims.  Del Monte Fresh

21  Produce Co. v. U.S., 570 F.3d 316, 323 (D.C. Cir. 2009).

22  Plaintiffs' underlying concern for Claim Three was Defendants'

23  indiscriminate capture and roundup of non-excess horses only to

24  release them back on the range.  And though Defendants are right

25  to say that the precise contours of any future gather are

26  "unknowable" and "speculative," this is not the proper test for

27  the "capable of repetition" exception.

28  ///

Rather, Plaintiffs need only show that there is a reasonable expectation that the same injury will befall them again.  This Court finds that Plaintiffs have met that burden, and thus, Claim Three under the Wild Horse Act is not moot.  Defendants' Motion to Dismiss Claim Three for mootness is DENIED.

### 2.   NEPA Violations

Defendants argue that Claims Five through Ten alleging NEPA violations are all moot, and should be dismissed for lack of justiciability.  Because NEPA only regulates the procedures that must be used prior to taking action, Defendants argue that once the proposed agency action is complete, the information can no longer serve its purposes, and NEPA is no longer applicable. Defendants maintain that no adequate remedy can be granted because the gathers have been completed, and so preparation of an EIS would not grant Plaintiffs any of the relief they seek. Defendants cite to <u>Feldman v. Bomar</u>, where the plaintiffs alleged only procedural violations under NEPA for defendants' decision to eradicate the feral pig population.  518 F.3d 637 (9th Cir. 2008).  The court in <u>Feldman</u> held that the matter was moot because the court could not "resurrect the pigs, nor take any other action to prevent or undo the eradication."  <u>Id.</u> at 643. Defendants argue that the instant matter is analogous in that the horses and burros have already been removed from the range, and cannot be returned as it is prohibited by the Wild Horse Act.

///

///

27

1    The Ninth Circuit has addressed the issue of mootness as it

2  pertains to NEPA claims, and has stated a policy that completion

3  of agency action does not necessarily moot a NEPA claim because

4  if that were the case, then agencies could "...merely ignore the

5  requirements of NEPA...and then hide behind the mootness

6  doctrine." West v. Secretary of the Dept. of Transp., 206 F.3d

7  920, 925 (9th Cir. 2000) (quoting Columbia Basin Land Protection

8  Ass'n v. Schlesinger, 643 F.2d 585, 591 n.1 (9th Cir. 1981)).  In

9  West, the court found that though the interchange project was

10  complete and even carrying traffic, the action was not moot

11  because there was a Stage 2 to the project which had not yet been

12  completed. Id.  Further, the court in West stated that it would

13  have remedial powers to correct NEPA violations, including

14  ordering additional environmental review, and even ordering the

15  interchange closed or taken down.  Id.  "Accordingly, defendants

16  in NEPA cases face a particularly heavy burden in establishing

17  mootness." Cantrell v. City of Long Beach, 241 F.3d 674, 678

18  (9th Cir. 2001).  Where effective relief is still available,

19  completion of agency action is insufficient to render a case

20  moot.  Id. at 679.

21    As noted above, Defendants have yet to finish adopting out

22  the selected horses and sending the remainder to long-term

23  holding facilities.  In light of West where even when the bulk of

24  the project was completed, the agency action was not considered

25  complete so long as further steps could be taken, Plaintiffs'

26  claims are not moot where effective relief can still be granted.

27  206 F.3d at 925.

28  ///

28

Plaintiffs' claims allege six NEPA violations, including failures
to prepare an EIS, explore a reasonable range of alternatives,
ensure scientific accuracy, meaningfully respond to dissenting
scientific opinion, disclose methodology, provide detailed
analysis of environmental impacts, and prepare an organized and
readily understandable EA.

Assuming each of Plaintiffs allegations are true, this Court
could conceivably provide relief in the form of an order
returning all animals in short-term and long-term holding
facilities to either Twin Peaks or the West until all
requirements of NEPA are met.  Further, this Court could issue an
order compelling Defendants to fully comply with NEPA
requirements for all future gathers.  This Court does not find
Feldman to be apropos as the horses have not been killed, and, as
noted above, at this motion to dismiss stage, it is not proper to
begin an analysis of the Wild Horse Act to determine if it does
in fact prohibit a return of horses to the range.  Defendants'
Motion to Dismiss Claims Five, Six, Seven, Eight, Nine, and Ten
is DENIED.

///
///
///
///
///
///
///
///
///

**CONCLUSION**

As a matter of law, and for the reasons set forth above,
Defendant's Motion to Dismiss Plaintiff's Complaint (ECF No. 68)
is DENIED as to all ten counts.

IT IS SO ORDERED.

Dated: April 19, 2011

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

30