1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   IN DEFENSE OF ANIMALS;
     DREAMCATCHER WILD HORSE AND
12   BURRO SANCTUARY; BARBARA
     CLARKE; CHAD HANSON;
13   LINDA HAY,                          No. 2:10-cv-01852-MCE-DAD

14          Plaintiffs,

15       v.                              <u>MEMORANDUM AND ORDER</u>

16   UNITED STATES DEPARTMENT OF
     THE INTERIOR; BUREAU OF LAND
17   MANAGEMENT; KEN SALAZAR,
     Secretary of the United States
18   Department of the Interior;
     ROBERT ABBEY, Director of the
19   Bureau of Land Management; KEN
     COLLUM, Acting Field Manager
20   of Eagle Lake Field Office,

21          Defendants.

22                          ----oo0oo----

23       Plaintiffs in this action, which consist of an animal rights

24   group along with a wild horse and burro sanctuary and other

25   concerned individuals, filed this action on July 15, 2010, to

26   halt a planned "gather," or round-up, of wild horses and burros

27   scheduled to commence on August 9, 2010, at the Twin Peaks Herd

28   Management Area ("HMA").

                                    1

Plaintiffs argued that the planned gather ran counter to the congressional mandate for preserving wild horses and burros as set forth in Wild Free-Roaming Horses and Burros Act, 16 U.S.C. § 1331, et seq. ("Act").  Plaintiffs also contended that the provisions of the National Environmental Policy Act ("NEPA") had been violated because the Environmental Assessment ("EA") for the gather failed to adequately analyze a reasonable range of alternatives, failed to ensure scientific integrity and dissenting opinion, and consequently failed to take the requisite "hard look" at the proposed action for NEPA purposes.  Because of the cumulative impacts occasioned by the gather and its unprecedented scope, Plaintiffs asked that the Court require the preparation of a comprehensive Environmental Impact Statement ("EIS") before moving forward with the gather.

Plaintiffs initially moved for preliminary injunctive relief on July 22, 2010 given the impending August 9, 2010, gather. Following the August 5, 2010, hearing on the Motion, the Court denied Plaintiffs request from the bench on grounds, inter alia, that Plaintiffs were not likely to prevail on the merits.  That ruling was followed by a Memorandum and Order filed August 9, 2010.  Plaintiffs immediately filed a notice of interlocutory appeal.  Plaintiffs' request for emergency injunctive relief was denied by the Ninth Circuit, and the gather proceeded. Plaintiffs' appeal was ultimately denied by the appeals panel on August 15, 2011, on grounds that because the gather had already occurred, the injunctive relief sought had become moot.

Defendants thereafter filed a motion to dismiss in this court, requesting that the entire lawsuit be thrown out as moot.

Because Plaintiff's complaint raised issues that remained justiciable, particularly since they could potentially resurface in future gathers, the Court denied the motion to dismiss by Memorandum and Order filed April 20, 2011.  Both Plaintiffs, the government and Defendant-Intervenor Safari Club International ("Safari Club") have now filed motions for summary judgment.  The parties agreed at the time of oral argument on those motions that the case should be resolved on summary judgment.

As set forth below, the Court will grant the summary judgment requests made on behalf of the government and the Safari Club and will deny Plaintiff's concurrent request for summary judgment.  Because the argument proffered by the parties closely track the arguments already made in connection with the earlier filed motion to dismiss, this Memorandum and Order closely follows the Court's previous April 20, 2011 ruling.

## BACKGROUND

The Twin Peaks HMA comprises some 789,852 acres of public and private lands on either side of the border between California and Nevada.  AR 15443.  Approximately 55 miles long from north to south, and 35 miles wide, slightly more than half of the HMA is located within Lassen County, California.  The remainder is in Washoe County, Nevada.  The Bureau of Land Management ("BLM") designated the Twin Peaks HMA as suitable for the long-term maintenance of wild horses and burros in 1981.  The Cal Neva Management Framework Plan established a multiple use balance between livestock, wild horses and wildlife in 1982.

The BLM's stewardship of public lands, including the oversight and management of wildhorses and burros, is predicated on principles of multiple use and sustained yield.  AR 15443, citing 43 U.S.C. § 173; see also AR 15450.

This case arises from the Bureau's decision, in 2010, to remove excess horses and burros from the Twin Peaks HMA.  A 158-page Final Environmental Assessment for the Twin Peaks Herd Management Area Wild Horse and Burro Gather Plan ("Gather EA") was released in May of 2010, and a Finding of No Significant Impact ("FONSI") was thereafter issued in July of 2010.  AR 15439, 15741, 15737.  BLM's goal in proposing the Gather EA was to restore a thriving ecological balance and to prevent further degradation of habitat caused by an overpopulation of wild horses.  AR 15442.  The EA represented the culmination of nearly a year of study, as aided by a 30-day scoping period as well as a 30-day period for public comment followed by a public meetings and a field tour.  AR 15550, 15746-47, 15750-51.  The BLM received more than 2,000 comments during this process and published in its decisions both a summary by subject matter as well as responses in each category.  AR 15746-47, 15750-83.

The population of wild horses and burros within the HMA has increased sharply since the first aerial population inventory was conducted in 1973.  At that time, 835 horses and 104 burros were recorded.  By 1977, the population was estimated to be at approximately 3,000 horses.  Because wild horses have few natural predators and are a long-lived species, and since documented foal survival rates exceed 95 percent, their population levels rise quickly.

Even though nine gathers within the Twin Peaks HMA have taken place since 1998, the estimated horse population has nonetheless almost doubled since 2004.  During the same period, burro numbers rose from 74 to more than 280 animals.

A direct count aerial population inventory taken in September of 2008 revealed some 1,599 horses and 210 burros.  At the time the EA at issue in these proceedings was prepared in July of 2010, the current population was estimated to be 2,303 horses and 282 burros, based on a twenty percent horse foal crop per year and a sixteen percent burro foal yield.  AR 15472.  This was close to 4.5 times more wild horses and 4 times more burros than the low range of the appropriate management level.  ("AML"). AR 15448.  The AML range for the Twin Peaks area had previously been determined as constituting between 448 and 758 wild horses, and 72 and 116 burros, as established through prior agency decision, including the applicable resource management plan.[1] See Court's August 9, 2010 previous Memorandum and Order denying preliminary injunction, ECF No. 53: 13-15.  AMLs are designed to ensure a thriving natural ecological balance consistent with multiple use objectives for the HMA.  Specifically, with respect to wild horses and burros, the AML is defined as the number of animals within an HMA which achieves and maintains a thriving natural ecological balance.  AR 15445.  The BLM strives to remove animals from the HMA, or take other remediation measures as necessary, when population numbers exceed the established AML.

---

[1] The BLM last revised the applicable resource management plan ("RMP") in 2008, after more than four years of public input and analysis.  See AR 15448, 3867-69.

1    Absent a gather of excess animals, the Bureau estimated that
2    in ten years, given similar growth predictions utilizing a median
3    rate of approximately 23 percent, the wild horse population would
4    exceed 6,000 to 8,000 head.  AR 15532.  Population modeling
5    indicated that figure could increase to as much as 19,264 head,
6    depending on what variables were used.  AR 15523.  According to
7    the BLM, such population increases would cause serious
8    degradation of the range's soils, vegetation, water sources,
9    riparian areas, cultural resources and wildlife habitat.  AR
10   15532, 15536-37, 15540-42; 15545, 15547-48.  Moreover, even aside
11   from the potential environmental degradation caused by too many
12   animals, the Bureau went on to predict that once the habitat
13   could no longer support such anticipated population growth, the
14   horses would likely "crash" and experience a "substantial death
15   loss."  AR 15532, 15534.

16   Since the EA was prepared, an in preparation for the
17   anticipated gather of excess horses and burros to begin on
18   August 9, 2010, the BLM conducted another aerial population
19   inventory on July 26, 2010.  That inventory yielded a count of
20   2,236 wild horses and 205 burros, numbers slightly less, but not
21   appreciably lower, than the projected figures, particularly with
22   respect to the horses.

23   Based on the above numbers, the EA estimated, "based on an
24   aerial direct count population inventory," that there were some
25   1,855 horses in excess of the AML lower limit in 2010, as well as
26   205 excess wild burros.

27   ///

28   ///

Compounding the situation, according to the BLM, is the fact that wild horses exceed the forage allocated to their use by 3 to 5 times, since they graze constantly throughout the year. Livestock, on the other hand, which are moved from place to place, average only some 59 percent for cattle and 32 percent for sheep of their allocated usage.  While range conditions (both water sources and vegetation) still remain fairly good, the BLM believes that decreasing the numbers of horses and burros is essential to avoid unduly depleting available resources in the long run, especially since their numbers increase so rapidly if left unchecked.

In order to trim current horse and burro populations to appropriate levels, the BLM proposed that an attempt be made to gather the entire population of horses and burros within the HMA. As indicated above, on July 8, 2010, after preparing its EA, a FONSI was issued with respect to another gather of excess animals.  The present lawsuit was thereafter filed on July 15, 2010.

Since previous gathers have typically rounded up only 80 to 90 percent of the animals, depending on the numbers actually retrieved, the EA estimated that about 180 horses will be released after the gather, leaving a total of some 450 horses and 72 burros in the HMA post-gather.  AR 15542.  Those numbers are consistent with the established AMLs.

///

///

///

///

The released horses would have a sex ratio of 60:40 studs to mares in order to help curb future population increases (AR 14457); in addition, some or all of the released mares (depending on the capture rates) would receive fertility control treatments (an immunocontraceptive known as Porcine Zona Pellucida, or PZP) designed to reduce their fecundity over the following two-year period.  See AR 155457-58.

Before the gather was scheduled to commence, and after the EA in this matter was issued, the BLM conducted another aerial population inventory to get a more exact count closer to the start of the gather.  That second inventory, completed on July 26, 2010, showed a total of 2236 excess horses and 205 burros.

The gather took place in August and September of 2010 using the helicopter drive method of capture.  Veterans were on site during the gather to examine animals and to make recommendations to BLM regarding the care and humane treatment of the animals.  See AR 15460.  After capture, BLM transported the wild horses to short-term holding facilities, and from there they were made available for adoption or sale to qualified individuals, or placed in long-term pastures.  Despite dire warnings, mortality rates as a result of the capture were much lower than expected.

Plaintiffs object to the proposed gather as a direct contravention of the Act.  They claim that the EA does not properly identify and categorize excess animals prior to capture. They further contend that the BLM has not adequately shown that HMA resources are being overtaxed by the current population of horses to the extent that there are indeed excess animals.

In addition, Plaintiffs allege that the EA does not properly analyze the combined effect of so many animals being gathered, along with the impact that widespread contraception will have on the animals and their social characteristics.  By failing to adequately address those issues, Plaintiffs claim that the EA runs afoul of NEPA's mandate that a "hard look" be taken prior to any significant environmental action.  The government and the Safari Club, on the other hand, argue that the EA was adequate and that no violations of either the Act or NEPA have been established.

## PROCEDURAL FRAMEWORK

Congress enacted NEPA in 1969 to protect the environment by requiring certain procedural safeguards before an agency takes action affecting the environment.  The NEPA process is designed to "ensure that the agency ... will have detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience." Blue Mountains Biodiversity Project v. Blackwood, 171 F.3d 1208, 121 (9th Cir. 1998).  The purpose of NEPA is to "ensure a process, not to ensure any result." Id.  "NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision-making to the end that the agency will not act on incomplete information, only to regret its decision after is it too late to correct." Center for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1166 (9th Cir. 2003).

Complete analysis under NEPA also assures that the public has sufficient information to challenge the agency's decision. Robertson v. Methow Valley Citizens, 490 U.S. 332, 349 (1989); Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1151 (9th Cir. 1998).

NEPA requires that all federal agencies, including the Forest Service, prepare a "detailed statement" that discusses the environmental ramifications, and alternatives, to all "major Federal Actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(c).  An agency must take a "hard look" at the consequences, environmental impacts, and adverse environmental effects of a proposed action within an environmental impact statement ("EIS"), when required.  Kleppe v. Sierra Club, 427 U.S. 390, 410, n.21 (1976).  To determine whether an EIS is required, an agency may first prepare an environmental assessment ("EA").  The objective of an EA is to "[b]riefly provide sufficient evidence and analysis to determining whether to prepare" an EIS.  40 C.F.R. § 1508.9(a)(1).  If the EA indicates that the federal action may significantly affect the quality of the human environment, the agency must prepare an EIS.  40 C.F.R. § 1501.4; 42 U.S.C. § 4332(2)(C).

In the event an agency determines that an EIS is not required, it must, as the BLM did here, issue a FONSI detailing why the action "will not have a significant effect on the human environment."  40 C.F.R. § 1508.13.  As is customary, the FONSI in this case is contained within the project EA.
///

1  The EA must support the agency's position that a FONSI is
2  indicated. <u>Blue Mountains</u>, 161 F.3d as 1214.

3      NEPA does not mandate that an EIS be based on a particular
4  scientific methodology, nor does it require a reviewing court to
5  weigh conflicting scientific data. <u>Friends of Endangered</u>
6  <u>Species, Inc. v. Jantzen</u>, 760 F.2d 976, 986 (9th Cir. 1985).
7  An agency must be permitted discretion in relying on the
8  reasonable opinions of its own qualified experts, even if the
9  court might find contrary views more persuasive. <u>See</u>, <u>e.g.</u>,
10 <u>Kleppe</u>, 427 U.S. at 420, n. 21.  NEPA does not allow an agency to
11 rely on the conclusions and opinions of its staff, however,
12 without providing both supporting analysis and data.  <u>Idaho</u>
13 <u>Sporting Cong.</u>, 137 F.3d at 1150.  Credible scientific evidence
14 that contraindicates a proposed action must be evaluated and
15 disclosed.  40 C.F.R. § 1502.9(b).  If an EA or EIS adequately
16 discloses effects, NEPA's goal is satisfied.  <u>Inland Empire Pub.</u>
17 <u>Lands Council v. U.S. Forest Serv.</u>, 88 F.3d 754, 758 (9th Cir.
18 1996) (emphasis in original).

19     In addition to arguing that the Forest Service violated NEPA
20 in this case, Plaintiffs also contend that the gather violated
21 the Wild Free-Roaming Horses and Burro Act, 16 U.S.C. § 1331,
22 et seq.  The Act, as discussed in more detail below, was enacted
23 to designate and maintain specific ranges on public lands as
24 sanctuaries for the horses' protection and preservation.  <u>Id.</u> at
25 § 1333(a).
26 ///
27 ///
28 ///

1     Because neither NEPA nor the Act contains provisions
2  allowing a private right of action (see Lujan v. National
3  Wildlife Federation, 497 U.S. 871, 882 (1990) and Ecology Center
4  Inc. v. United States, 192 F.3d 922, 924 (9th Cir. 1999) for this
5  proposition under NEPA and NFMA, respectively), a party can
6  obtain judicial review of alleged violations of NEPA only under
7  the waiver of sovereign immunity contained within the
8  Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  Earth
9  Island Institute v. U.S. Forest Serv., 351 F.3d 1291, 1300
10 (9th Cir. 2005).
11     Under the APA, the court must determine whether, based on a
12 review of the agency's administrative record, agency action was
13 "arbitrary and capricious," outside the scope of the agency's
14 statutory authority, or otherwise not in accordance with the law.
15 Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1356
16 (9th Cir. 1994).  Review under the APA is "searching and
17 careful."  Ocean Advocates, 361 F.3d at 1118.  However, the court
18 may not substitute its own judgment for that of the agency.  Id.
19 (citing Citizens to Preserve Overton Park, Inc. v. Volpe,
20 401 U.S. 402 (1971), overruled on other grounds by Califano v.
21 Sanders, 430 U.S. 99 (1977)).
22     In reviewing an agency's actions, then, the standard to be
23 employed is decidedly deferential to the agency's expertise.
24 Salmon River, 32 F.3d at 1356.  Although the scope of review for
25 agency action is accordingly limited, such action is not
26 unimpeachable.  The reviewing court must determine whether there
27 is a rational connection between the facts and resulting judgment
28 so as to support the agency's determination.

1 Baltimore Gas and Elec. v. NRDC, 462 U.S. 87, 105-06 (1983),

2 citing Bowman Trans. Inc. v. Arkansas-Best Freight Sys. Inc.,

3 419 U.S. 281, 285-86 (1974).  An agency's review is arbitrary and

4 capricious if it fails to consider important aspects of the

5 issues before it, if it supports its decisions with explanations

6 contrary to the evidence, or if its decision is either inherently

7 implausible or contrary to governing law.  The Lands Council v.

8 Powell, 395 F.3d 1019, 1026 (9th Cir. 2005).

9

10                                **STANDARD**

11

12      Summary judgment is an appropriate procedure in reviewing

13 agency decisions under the dictates of the APA.  See, e.g.,

14 Northwest Motorcycle Assn. v. U.S. Dept. Of Agric., 18 F.3d 1468,

15 1471-72 (9th Cir. 1994).  Under Federal Rule of Civil Procedure

16 56, summary judgment may accordingly be had where, viewing the

17 evidence and the inferences arising therefrom in favor of the

18 nonmovant, there are no genuine issues of material fact in

19 dispute."  Id. at 1472.  In cases involving agency action,

20 however, the court's task "is not to resolve contested facts

21 questions which may exist in the underlying administrative

22 record," but rather to determine whether the agency decision was

23 arbitrary and capricious as defined by the APA and discussed

24 above.  Gilbert Equipment Co., Inc. v. Higgins, 709 F. Supp.

25 1071, 1077 (S.D. Ala. 1989); aff'd, Gilbert Equipment Co. Inc. v.

26 Higgins, 894 F.2d 412 (11th Cir. 1990); see also Occidental Eng'g

27 Co. v. INS, 753 F.2d 766, 769 (9th Cir. 1985).

28 ///

                                  13

Consequently, in reviewing an agency decision, the court must be "searching and careful" in ensuring that the agency has taken a "hard look" at the environmental consequences of its proposed action.  Ocean Advocates v. U.S. Army Corps of Engineers, 402 F.3d 846, 858-59 (9th Cir. 2005);  Or. Natural Res. Council v. Lowe, 109 F.3d 521, 526 (9th Cir. 1997).

Because neither NEPA or the Wild Horse Act contain an internal standard of review, both statutory provisions and applicable case law confirm that the APA's "arbitrary and capricious" standard applies.  See 5 U.S.C. § 706(2)(A); Am. Horse Prot. Ass'n v. Frizzell, 403 F. Supp. 1206, 1217 (D. Nev. 1975).

**ANALYSIS**

**A.  Violations of the Act**

In enacting the Wild Free-Roaming Horses and Burros Act ("Act") in 1971, Congress mandated that wild horses, as "living symbols of the historic and pioneer spirit of the West," were to be "protected from capture, branding, harassment or death," and as such were to be considered an "integral part" of public lands in areas where they were presently found.  16 U.S.C. § 1331.  The BLM, as the designate of the Secretary of Interior, is directed to accomplish this by maintaining "specific ranges on public lands as sanctuaries for their protection and preservation."  Id. at § 1333(a).

///

14

Within only a few years of the Act's passage, however, action became necessary "to prevent a successful program from exceeding its goals and causing animal habitat destruction." American Horse Prot. Ass'n v. Watt, 694 F.2d 1310, 1316 (D.C. Cir 1982) (quoting H.R. Rep No. 95-1122, at 23 (1978j); see also Blake v. Babbitt, 837 F. Supp. 458, 459 (D.D.C. 1993)("[e]xcess numbers of horses and burros pose a threat to wildlife, livestock, the improvement of range conditions, and ultimately [the horses themselves]") (citation omitted). Accordingly, in 1978, Congress amended the Act to provide BLM with greater authority and discretion to manage and remove excess horses from the rangeland. Id. Excess animals are defined as animals "which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area" as well as horses that have been removed from an area pursuant to applicable law. 16 U.S.C. § 1333(b)(2).

To this end, the 1978 Amendments require that the BLM "maintain a current inventory of the animals". Id. at § 1333(b). As Congress explained,

> "The purpose of such inventory shall be to: make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; **determine appropriate management levels of free-roaming horses and burros on these areas of the public lands; and determine whether appropriate management levels should be achieved by the removal or destruction of excess animals,** or other options (such as sterilization, or natural controls on population)."

Id. (emphasis added).

///
///

1    Although "all management activities shall be at the minimal

2  feasible level," the Act goes on to unequivocally provide that if

3  the current population inventory for an HMA reveals that

4  overpopulation exists, and if the BLM determines that "action is

5  necessary to remove excess animals," it "shall immediately remove

6  excess animals from the range so as to achieve appropriate

7  management levels."  Id. at § 1333(b)(2).

8    In its Watt decision, the District of Columbia Circuit

9  recognizes the importance of permitting the BLM to quickly act in

10  order to address overpopulation issues, based on whatever

11  information to that effect becomes available:

12      "The most important 1978 amendment, for our purposes,
        is section 1333(b)(2).  That section addresses in
13      detail the information upon which BLM may rest its
        determination that a horse overpopulation exists in a
14      particular area.  The Agency is exhorted to consider
        (i) the inventory of federal public land, (ii) land use
15      plans, (iii) information from environmental impact
        statements, [and] (iv) the inventory of wild horses,
16      But the Agency is explicitly authorized to proceed with
        the removal of horses "in the absence of the
17      information contained in (i-iv)."  Clauses (i-iv) are
        therefore precatory; in the final analysis, the law
18      directs that horses "shall be removed "immediately"
        once the Secretary determines, **on the basis of whatever**
19      **information he has at the time of his decision**, that an
        overpopulation exists.  The statute thus clearly
20      conveys Congress's view that BLM's findings of wild
        horse overpopulations should not be overturned quickly
21      on the ground that they are predicated on insufficient
        information."

22

23  Watt, 694 F.2d at 1318 (emphasis in original).

24  ///

25  ///

26  ///

27  ///

28  ///

In removing excess animals, the Act proceeds to prescribe an order in which removal of the animals should be addressed, starting with old, sick or lame animals (which should be destroyed in the most humane manner possible), then proceeding to adoptable horses and burros which can be removed for "private maintenance and care." Id. at § 1333(b)(2)(A-B). Although the terms of the Act actually provide that excess animals for which an adoption demand does not exist should be "destroyed in the most humane and cost efficient manner possible," in fact Congress has never appropriated funds for extermination, as opposed to ongoing maintenance, of excess horses even if not adopted.

Plaintiffs initially argue that BLM's proposed gather violates the Act because the animals are not removed according to the priority established by § 1333(b). By rounding up all horses and burros, according to Plaintiffs, BLM ignores the statutory mandate that old, sick and lame animals be eliminated first before determining if the number of remaining healthy animals exceeds viable limits. A careful reading of the Act, however, indicates only that "[t]he Secretary **shall order** old, sick, and lame animals to be destroyed in the most humane manner possible. 16 U.S.C. § 133(b)(2)(A) (emphasis added). The operative verb used is "order," not "destroy," with the directive to destroy preceding any action that actually effectuates that directive. The Gather Plan complies with the statutory framework by ordering that old, sick or lame horses be destroyed after they are determined to be in that condition after being removed from the range.
///

17

1  AR 15526, 15556 (following roundup, inspectors are to "determine

2  if animals must be euthanized and provide for the destruction of

3  such animals").[2]   The Court agrees with the government that making

4  a determination with respect to the health of the animals on the

5  range is impracticable.  While Plaintiffs argue that the

6  selection process in that regard could be accomplished by simply

7  using a pair of binoculars, making a definitive health assessment

8  absent close-up examination would appear all but impossible.

9  See, e.g., In Defense of Animals v. Salazar, 675 F. Supp. 2d 89,

10 97-98 (D.D.C. 2009).  Moreover, euthanizing animals on the range

11 on the basis of only cursory inspection would ignore the active

12 use of the word "order" in the statute by calling for actual

13 destruction before any gather is even attempted.[3]

14      It should also be emphasized that an agency like BLM has

15 considerable discretion on how to carry out the directives of the

16 Act in any event.

17 ///

18 ///

19 ───────────────────

20      [2] The Court rejects Plaintiffs' reliance on a piece of
   legislative history that omits the word "order" as an attempt to
21 inappropriately rewrite the statutory language based on
   legislative history that offers no definitive interpretive
22 guidance and amounts to little more than speculation.  See
   Howell-Robinson v. Albert, 384 B.R. 19, 24 (D.D.C. 2008).

23      [3] At the very least, the statutory use of the word "order"
   as the operative verb makes it ambiguous whether the Bureau has
24 to destroy infirm horses before gathering them for other
   disposition, and given that ambiguity the Bureau's interpretation
25 is entitled to so-called Chevron deference.  Chevron v. N.R.D.C.,
   467 U.S. 837, 843 (1984) ("[I]f the statute is silent or
26 ambiguous with respect to the specific issue, the question for
   the court is whether the agency's answer is based on a
27 permissible construction of the statute.") Because the Court
   concludes that the Bureau's reading of the statute is a
28 reasonable one it will accordingly defer to that interpretation.

1   <u>Watt</u>, 694 F. 2d at 1318; <u>Am. Horse Prot. Ass'n v. Frizzell</u>,

2   403 F. Supp. 1206, 1217 (D. Nev. 1975) (noting that BLM must be

3   afforded a "high degree of discretionary authority" in managing

4   herds).  This discretion extends to BLM officials being allowed

5   to develop their own methodology for computing the "appropriate

6   management levels" ("AMLs") for the wild horse and burro

7   populations they are entrusted to protect.  <u>Fund for Animals v.</u>

8   <u>BLM,</u> 460 F.3d 13, 15 (D.C. Cir. 2006).  Given that discretion,

9   culling disabled animals from a more comprehensively captured

10  group of horses and burros is a method falling within the BLM's

11  discretion.  While Plaintiffs urge that this vetting process

12  should occur on the range, as indicated above from a pragmatic

13  viewpoint it is difficult to see how effective selection could

14  occur absent some capture process.  In its <u>Defense of Animals v.</u>

15  <u>Salazar</u> opinion, the District of Columbia Court of Appeals

16  rejected an argument similar to Plaintiffs', stating as follows:

17      "The plaintiffs' interpretation of the Wild Horse Act
        is also unpersuasive as a matter of logic.  Under the
18      plaintiff's reading, no healthy horse may be captured
        before all old and infirm horses are destroyed.  This
19      interpretation creates an impossible Catch-22 for the
        agency: To evaluate the age and health of a horse, a
20      veterinarian must presumably be close to it for a
        significant period of time.  A wild horse is unlikely
21      to submit to such an inspection voluntarily; it would
        have to be restrained or, more likely, confined- in
22      other words, captured.  But if, as the plaintiffs
        contend, the Bureau cannot capture a healthy horse
23      before euthanizing all unhealthy ones, and cannot
        determine whether a horse is healthy or unhealthy
24      without capturing it, the agency cannot begin the
        removal process, despite its statutory mandate to do
25      so.  A statute should not be construed to produce
        absurd results. (citation omitted).  As a result, the
26      Wild Horse Act cannot logically be read to forbid the
        capture of healthy horses prior to the euthanization of
27      unhealthy  ones."

28  ///

1  <u>In Defense of Animals v. Salazar</u>, 675 F. Supp. 2d 89, 97-98

2  (D.D.C. 2009).  Importantly, too, the <u>Salazar</u> case goes on to

3  find that rounding up the vast majority of a herd for sorting

4  does not "remove" all horses simultaneously from the range, since

5  some of the horses are ultimately returned to the wild.  <u>Id.</u> at

6  97.  Consequently, contrary to Plaintiffs' argument, "removal"

7  does not occur before a determination is made of what horses are

8  in fact "excess."  Consequently, the Act's mandate is not

9  contravened.

10     While Plaintiffs rely heavily on the decision in <u>Colorado</u>

11 <u>Wild Horse and Burro Coalition v. Salazar</u>, 639 F. Supp. 2d 87

12 (D.D.C. 2009), that case in inapposite since it involved removal

13 of all wild horses in the West Douglas Herd Area in Colorado, and

14 because the BLM in that case had not made an excess determination

15 due to an overpopulation of horses.  Here, on the other hand, the

16 BLM made a specific determination of just how many animals in the

17 Twin Rivers HMA were excess, based upon established "appropriate

18 management levels" ("AMLs") and other considerations in promoting

19 multiple uses of the federal lands in question.

20     With respect to what constitutes an appropriate AML, as

21 already indicated BLM officials are also afforded significant

22 discretion with respect to the wild horse and burro populations

23 they manage.  <u>See</u> 16 U.S.C. § 1333(b).  According to the BLM, the

24 AMLs in question here have been developed over the course of many

25 years.  Moreover, and in any event, the BLM has discretion in

26 determining whether an excess population in fact exists, since

27 the Secretary can make that determination "on the basis of

28 whatever information he has at the time of his decision."

1  <u>Am. Horse Prot. Ass'n v. Watt</u>, 694 F.2d 1310, 1318, (D.C. Cir.

2  1982).  The Bureau's determinations in that regard are entitled

3  to deference.

4      Although Plaintiffs contend that population levels under the

5  Act should be determined solely with reference to a "thriving

6  natural ecological balance" ("TNEB"),[4] that argument appears

7  misplaced since the statute, as stated above, specifically

8  equates excess animals with AML levels.  <u>See</u> 16 U.S.C.

9  § 1333(b)(2) (if overpopulation exists, the BLM "must immediately

10  remove excess animals from the range so as to achieve appropriate

11  management levels.").

12      AMLs are determined though revisions to the applicable

13  Resource Management Plan, or RMP.  As the Gather EA notes, AMLs

14  are established in order to ensure both a thriving natural

15  ecological balance and a multiple use relationship in the HMA.

16  AR 15448.  The BLM works to achieve AML guidelines on the range

17  in order to achieve a TNEB.  AML is a vehicle used to move

18  towards a TNEB, and a trigger by which the BLM is alerted to

19  address population imbalance.  Despite Plaintiffs' argument to

20  the contrary, TNEB represents an overall objective rather than

21  the means to accomplish it.

22  ///

23  ///

24  ///

25

26      [4] Plaintiffs rely on a 1978 amendment to the act which
   defined "excess" horses as applying only to animals that "must be
27  removed from an area in order to preserve and maintain a thriving
   natural ecological balance.  16 U.S.C. § 1332(f).  The argument
28  appears to be circular, however, since TNEB is otherwise linked
   to AML determinations.

1  That means, in the form of AML (as well as other factors the BLM
2  has the discretion to consider in determining overpopulation) has
3  already been determined and, as indicated above, no challenge to
4  the operative RMP and its AML determination is presently being
5  made.

6      Here, as discussed above, the wild horse population in the
7  Twin Peaks HMA well exceeded the high end of the AML, therefore
8  compromising the preservation and maintenance of a thriving
9  natural ecological balance in the preserve.  <u>See</u>, <u>e.g.</u>, AR 15442
10 (excess determination); AR 15442-15443 (noting insufficient
11 forage to sustain growing herd, impaired riparian and wetland
12 habitats, and impaired cultural resource cites); <u>see</u> <u>also</u> 15494-
13 15502 (discussing condition of riparian and wetland sites).
14 These determinations suffice in meeting the requirements of the
15 Act for determining that an excess population existed.

16     While Plaintiffs claim that horse and burro populations
17 should be given priority within the HMA, and that a greater share
18 of available resources (and presumably different AMLs) should be
19 allocated to them as opposed to cattle or other livestock, that
20 argument fails.  First, to the extent that Plaintiffs propose
21 that the multi-use parameters for the HMA be changed, such a
22 change cannot be made within the confines of this action.
23 Rangeland stewardship is established through periodically
24 prepared resource management plans.  <u>See</u> 43 U.S.C. § 1712;
25 43 C.F.R. Part 1600.  The resource management plan applicable to
26 the Twin Rivers HMA was last revised in 2008, after more than
27 four years of public input and analysis.
28 ///

Any challenge to how range use is allocated must be made administratively through the Federal Land Policy and Management Act, 43 U.S.C. § 1701, et seq., and not through the Wild Free-Roaming Horses and Burros Act.  Allowing Plaintiff to litigate the propriety of AMLs in this case outside the RMP process (as they ostensibly attempt to do since no formal RMP challenge is present here) would amount to an end-run around the proper procedures for effectuating revisions to the applicable RMP.

Plaintiffs' argument that the HMA must be managed "principally" for wild horse and burro use is also unpersuasive. The Act is a land and resource management statute which requires the BLM to "manage wild free-roaming horses and burros as **components** of the public lands.  16 U.S.C. § 1333 (a) (emphasis added).  As enacted in 1971, the Act states only that ranges should be "devoted principally but not necessarily exclusively to horse and burro welfare in keeping with the multiple-use management concept for the public lands."  Id. at § 1333(c). Although even this language does not mandate that only horse and burro interests be considered, in 1978 Congress amended the act to make it clear that BLM must strive for a balance that meets the needs of all range users.  As the D.C. Circuit explained,

> "The main thrust of the 1978 amendments is to cut back on the protection the Act affords wild horses, and to reemphasize other uses of the natural resources wild horses consume.  The amendments introduce a definition of "excess" horses: horses are in "excess" if they "must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area."

///
///

23

1  <u>Am. Horse Prot. Ass'n Inc. v. Watt</u>, 694 F.2d 1310, 1316 (D.C.

2  Cir. 1982) (citing 16 U.S.C. § 1332(f); <u>see also</u> <u>Blake v.</u>

3  <u>Babbitt,</u> 837 F. Supp. 458, 459 (D.D.C. 1993) ("[t]he amendments

4  make it clear the importance of management of the public range

5  for multiple uses, rather than emphasizing wild horse needs.")

6      The legislative history underlying the 1978 amendments

7  further illuminates Congress' intent:

8      "The goal of wild horse and burro management, as with
        all range management programs, should be to maintain a
9      thriving ecological balance between wild horse and
        burro populations, wildlife, livestock and vegetation,
10     and to protect the range from the deterioration
        associated with overpopulation of wild horses and
11     burros."

12 Conference Report 95-1737, October 6, 1978 to accompany H.R.

13 10587, Public Rangelands Improvement Act of 1978.  The Act should

14 consequently not be viewed as requiring that the BLM increase the

15 numbers of horses, or give wild horses priority over other users.

16 <u>See</u> <u>Fallini v. Hodel</u>, 725 F. Supp. 1113, 1118 (D. Nev. 1989)

17 (holding that the Act does not give horses higher status than

18 cattle on public lands).  Instead, the focus of the Act is

19 rightly viewed as protecting wild horse herds as one component of

20 multiple species, and many users, sharing a common environment.

21      Plaintiffs also point to the Act's mandate that the BLM's

22 management of horses and burros be at a "minimal feasible level"

23 in arguing that the gather proposed here be enjoined.  That

24 language, however, taken from § 1333(a), must be read in

25 conjunction with the equally clear directive that the Bureau

26 adopt a multiple-use management program, as set forth in

27 § 1332(c).

28 ///

24

As already noted above, horse populations in the HMA have increased dramatically in recent years, and has approximately doubled since 2004, despite numerous gathers.  Left unchecked, it appears the horse population could increase as much as 25 percent annually.[5]  The BLM has already established that current populations within the HMA exceed appropriate management levels by more than five fold at the low range and by more than three times at the high end of the spectrum.  Given the clear statutory mandate that "excess" horses be removed, the proposed gather does not run afoul of the requirement that only "minimal" management be employed.  Moreover, given the burgeoning population, efforts to slow reproduction (and the need to remove excess horses in the future) through immunocontraceptives administered to released mares, and through a skewed sex ratio of mares to stallions, is also within the Act's purview given the circumstances of this case.

Plaintiffs claim that removal of horses from the range, particularly when combined with immunocontraceptive use and unnatural sex skewing, is hardly management at the requisite "minimum feasible level."  Plaintiffs fail to appreciate, however, that such treatments are specifically designed to slow the growth rate and consequently decrease the need to remove horses and burros from the range in the future.

---

[5] The EA estimates that populations are likely to increase at between 23 and 25 percent a year.  AR 15532.  This means, as the EA also points out, that wild horse population in the Twin Peaks HMA, absent any gather and removal, would exceed 6,000 to 8,000 head within ten years, based on application population increase estimates.  This is significantly in excess of the AML range for the horse population, at between 448 and 758.

1  In that sense, the BLM's actions are clearly designed to minimize

2  intervention in the long run.

3      Plaintiffs fare no better in arguing that the planned

4  storage and transport of wild horses to BLM long-term holding

5  facilities is illegal under the Act.  While 16 U.S.C. § 1339 does

6  prohibit BLM from relocating wild horses and burros "to areas of

7  the public lands where they do not presently exist," the Act is

8  silent with respect to private lands.  Since the BLM has been

9  barred by an appropriations statute from euthanizing health

10 excess horses (see AR 15529), relocation to private facilities is

11 necessary given the Act's mandate that excess horses be removed.

12 Significantly, as the government points out, Congress has

13 repeatedly provided funding to BLM for the operation of

14 facilities to house excess animals on private lands.[6]  By making

15 those appropriations, Congress has expressly acknowledged and

16 approved the Bureau's use of private facilities for the long-term

17 holding of excess horses.[7]

18 _____

19    [6] Since Congress prohibited the destruction of health excess
   horses, while retaining the statutory mandate to immediately

20 remove excess horses from the range if necessary to achieve a
   thriving natural ecological balance, it created a "gap" for the

21 agency to fill pursuant to an express or implied delegation of
   authority to the agency.  Action given that gap is entitled to

22 so-called Chevron deference.  Railway Labor Execs' Ass'n v. Nat'l
   Mediation Bd., 29 F.3d 655, 671 (D.C. Cir. 1994 (en banc)

23 (quoting Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S.
   837, 843-44 (1984)).

24

25    [7] According to the Gather EA, these private facilities
   consist of long-term holding grassland pastures in Oklahoma,

26 Kansas, and South Dakota "large enough to allow free-roaming
   behavior and with the forage, water, and shelter necessary to

   sustain [the animals] in good condition."  AR 15528-29.

27 Interestingly, while Plaintiffs argue that relocation to holding
   facilities forever alters the animals' wild and free-roaming

28                                          (continued...)

                              26

In 1990, for example, the Appropriations Committee stated that it "continues to support the use of private sanctuaries as a method of removing unadopted wild horses and burros," and directs BLM to "continue to investigate private sanctuary proposals that are found to be humane and cost effective."  S. Rep. No. 534, 101st Cong., 2nd Sess., 6, 1990 WL 201783 (1990).[8]

In sum, for all the above reasons, the Court finds that the BLM's conduct of the 2010 Twin Peaks Gather did not run afoul of the provisions of Wild Free-Roaming Horses and Burros Act, and that the government and the Safari Club are accordingly entitled to judgment as a matter of law as to Plaintiffs' allegations that the 2010 Gather violated the Act.

///

///

///

///

///

---

[7] (...continued)
behavior, transfer to the private facilities enumerated above would appear to be far more consistent with that behavior than the other options for disposing of excess horses and burros contemplated by the Act; namely, adoption, euthanasia or commercial sale.

[8] The Court specifically rejects Plaintiffs' argument that the holding facilities where the excess animals are housed, while privately owned, are nonetheless "administered" by BLM and should accordingly qualify as public lands upon which the animals did not previously exist (the use of which is barred under the Act). The administrative record shows that the BLM, at the most, simply periodically checks to ensure than the long-term holding contractors are complying with the terms of their housing agreements.  See, e.g., AR 28575, 28842, 29233.,  Plaintiffs' suggestion that this responsible oversight on the BLM's part transforms private land into public land is without merit.

**B.  NEPA Violations**

     In addition to arguing that the proposed gather violates the Wild Horses Act, Plaintiff also claims that the gather's underlying EA runs counter to the provisions of NEPA, since it failed to take the requisite "hard look" at the environmental impact of the action.  See Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976).  Not every action, however, requires a comprehensive EIS, however; rather, if the agency concludes that there will be no significant environmental impact on the basis of a less detailed EA, it can issue a Finding of No Significant Impact, as the BLM did here on the basis of the 158-page EA that was prepared.  The Court's review of the EA under NEPA should be limited to whether the BLM took a hard look at the environmental consequences of the gather; it must not substitute its own judgment for that of the agency.  See Okanogan Highlands Alliance v. Williams, 236 F.3d 468, 473 (9th Cir. 2000) (citing Kleppe, supra).

     Despite the BLM's preparation of a lengthy EIS in this matter, Plaintiffs argue that it was still error to have not prepared a full EIS given the 2010 Twin Peak Gather's combination of both a significant roundup (some 80 to 90 percent of the herd) and the additional herd manipulations that were approved, including the immunocontraceptive use and sex skewing designed to curb further population growth.  According to Plaintiffs, this combination creates a dangerous "precedent" for additional wide-ranging roundups that made preparation of an EIS even more imperative.

1  Plaintiffs' argument in this regards ignores the fact that EAs

2  are "usually highly specific to the project and the locale, thus

3  creating no binding precedent." Barnes v. U.S. Dept. Of Transp.,

4  655 F.3d 1124, 1140 (9th Cir. 2011), citing Town of Cave Creek v.

5  FAA, 325 F.3d 320, 332 (D.C. Cir. 2003). This Court accordingly

6  rejects Plaintiffs' argument that the scope of the project in

7  itself required a full EIS.

8      Plaintiffs go on to claim that the EA failed to consider

9  sufficient alternatives to its proposed gather plan. A review as

10 to the adequacy of such alternatives, however, is governed by a

11 "rule of reason" commensurate with the EA's statement of purpose

12 and need. See City of Carmel-By-The-Sea v. U.S. Dep't of

13 Transp., 123 F.3d 1142, 1156 (9th Cir. 1997). As set forth

14 above, given the rapidly increasing horse and wild burro

15 population and the BLM's obligation to consider other range users

16 in addition to the horses and burros, it appears clear that given

17 the established ALM range for the animals, wild horses and burros

18 exceeded recommended levels by between three and five times. The

19 EA indicates that the agency thoroughly examined the direct,

20 indirect, and cumulative impacts of the proposed gather, of

21 taking no action, and of two alternative actions. AR 15520-15550

22 (impacts), AR 15456-15462 (alternatives). While the agency did

23 eliminate from serious consideration another fourteen options (as

24 suggested by the public) that did nothing to decrease horse and

25 burro population, since that corresponded neither with their

26 objective or the statutory mandate that excess animals be removed

27 (AR 15462-15468) it did look seriously at the above-described

28 four different alternatives before settling on the proposed action.

1  Plaintiffs' reliance on a NEPA alternatives claim to attack the

2  EA is misplaced under these circumstances.

3       Plaintiffs argue that the BLM should have considered

4  alternatives short of its decision to relocate a large part of

5  the Twin Peaks herd, and allege that BLM's decision to limit

6  consideration of other potential measures was "arbitrarily

7  narrow."  As the government points out, Plaintiff's suggestion

8  that the BLM should have reduced livestock grazing levels and

9  fenced off sensitive riparian sites and springs simply does not

10 address the Act's requirement that overpopulation be kept in

11 check.  The EA explained, for example, how reduced livestock

12 grazing would have done nothing to decrease the rapidly

13 burgeoning wild horse and burro population.  AR 15462-63.  Nor

14 was Plaintiffs' suggestion that excess population be controlled

15 through natural predators like mountain lions any more realistic.

16 The EA noted that, based on decades of monitoring, the number of

17 instances where lions have killed horses is "extremely low" and

18 "cannot be considered a viable factor in population control."

19 AR 15471.

20      The alternatives advanced by Plaintiffs were inadequate

21 because they did not reduce population and therefore accomplish

22 BLM's objective and the requirements of the Act.  NEPA does not

23 compel an agency to consider alternatives that would not fulfill

24 the objectives of a proposed project.  See, e.g., Laguna

25 Greenbelt, Inc., v. U.S. Dep't of Transp., 42 F.3d 517, 524

26 (9th Cir. 1994) (agencies need not "consider alternatives which

27 are infeasible, ineffective, or inconsistent with the basic

28 policy objectives for the management of the area").

1 Under the so-called "rule of reason" articulated by the Ninth
2 Circuit in its City of Carmel case, then, the BLM analyzed an
3 adequate range of alternatives in the EA it prepared in advance
4 of the 2010 Twin Peaks Gather.

5      Plaintiffs also claim that the subject EA is lacking
6 scientifically and fails to adequately respond to dissenting
7 scientific opinion.  Examination of the lengthy EA, however,
8 indicates that all aspects of the proposed gather were carefully
9 considered.  While Plaintiffs take particular aim at the plan to
10 skew the sex ratio of released animals to 60 percent male, and
11 inject some mares with immunocontraceptives, those actions will
12 not apply to animals not gathered (typically a capture rate of
13 only about 80 percent is achieved).  Moreover, the EA explains in
14 detail why those measures were necessary to help curb further
15 population increase.  The EA determined, for example, that the
16 PZP contraception is completely reversible, meets BLM
17 requirements for safety to mares and to the environment, and can
18 be easily administered in the field.  AR 15530.  It also
19 disclosed the impacts of the PZP contraceptive vaccine.  Id. at
20 Id. at 15529-30.  At least one district court has found that the
21 PZP contraceptives in question are not so uncertain as to require
22 an EIS.  Cloud Foundation v. Kempthorne, 2008 WL 2794741 at *9
23 (D. Mont. 2008).

24 ///
25 ///
26 ///
27 ///
28 ///

1 According to the previously submitted Declaration of Albert J.

2 Kane, a Senior Staff Veterinarian for the United States

3 Department of Agriculture who also serves as an adviser to the

4 BLM's Wild Horse and Burro program on matters related to animal

5 care, PZP treatments have been administered to free roaming wild

6 horses since the 1990's, and since 2004, the BLM has safely

7 administered over 2,700 doses of the vaccine in over 75 herd

8 management areas, with no evidence of the treatment having any

9 effect on population ecology.  Kane Decl., ¶ 28, ECF No. 31, as

10 cited in Gov't's Opening Papers, ECF No. 111, 30:13-16.

11     Although Plaintiffs appear to contend that the BLM failed to

12 adequately respond to scientific studies that show the

13 contraceptives to be more effective during their limited (up to

14 two year) period of efficacy (the BLM's scientists estimated up

15 to 80 perfect effectiveness, whereas Plaintiffs point to studies

16 suggesting that the effectiveness might be closer to 100

17 percent), the fact that the BLM chose to stand by its own

18 estimates after acknowledging the information provided by

19 Plaintiffs does not make the EA insufficient.  An agency has the

20 discretion to rely on the reasonable opinion of its own experts

21 (Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989)),

22 and agencies are accorded particular deference with respect to

23 scientific issues within their area of expertise.  See Sw. Ctr.

24 for Biological Diversity v. Bureau of Reclamation, 143 F.3d 515,

25 523 (9th Cir. 1998).  Because the EA has given a thorough and

26 reasoned explanation for its determinations, the expert analyses

27 contained therein are entitled to substantial weight.

28 ///

1   See, e.g., Native Ecosystems Council v. U.S. Forest Serv.,
2   428 F.3d 1233, 1244 (9th Cir. 2005).

3       The BLM may nonetheless be vulnerable given the fact that
4   certain scientific studies (Cooper and Larsen (2006) and Nunez
5   et al. (2009)) questioned the long-term effects of PZP on herd
6   behavior, particularly when repeatedly administered.  Chad Hanson
7   emphasized those studies in his own report, which the BLM largely
8   dismissed.  The studies upon which Hanson relies, however, appear
9   to largely be concerned about "possible" effects, and therefore
10  can be distinguished on that basis since effects that are only
11  "possible" do not represent true "dissenting" views.  Moreover,
12  the vaccine to be administered in the course of the 2010 Twin
13  Peaks Gather was a single, first time dose as opposed to the
14  Cooper and Larson and Nunez studies which assessed the effects on
15  horses of repeated doses of PZP.  The studies, and Hanson's
16  reliance on them, can be distinguished from the present case on
17  that ground as well.

18      Plaintiffs also claim that the scientific integrity of the
19  EA was compromised, and violated NEPA, because the BLM failed to
20  make available hard data (in the form of so-called Riparian
21  Functional Assessments, or "RFAs") it used to conclude that some
22  riparian/spring sites were damaged and in a state of decline due
23  to damage caused primarily by wild horses and burros.  Plaintiffs
24  further contend that methodology used for aerial population
25  inventories was not disclosed, also in contravention of NEPA's
26  requirement that a reasoned analysis occur based on the evidence
27  being made "available to all concerned."  Friends of Endangered
28  Species, Inc. v. Jantzen, 760 F.2d 976, 986 (9th Cir. 1985).

33

1   Plaintiffs claim the allegedly withheld evidence undermined the
2   "informed decision making" that results from hard data being
3   provided for scrutiny by all concerned.  Pls.' Reply, 46:20-25.

4        The EA contains an extensive discussion on the effects of
5   wild horses and burros on riparian and wetland sites and explains
6   how the BLM determined that certain of those impacts were
7   attributable to wild horses and burros rather than livestock.
8   AR 15494-15502.  The RFAs were expressly referred to in the body
9   of the EA, and the results of the assessments were duly
10  summarized.
11  As the government notes, NEPA's implementing regulations
12  encourage agencies to incorporate material by reference,
13  particularly in an EIS.  See 40 C.F.R. § 1500.4(j); § 1502.21
14  ("Agencies shall incorporate material into an [EIS] by reference
15  when the effect will be to cut down on bulk without impeding
16  agency and public review of the action").

17       With respect to the BLM's methodology for obtaining
18  population inventories of the animals, Plaintiffs' argument that
19  the EA failed to provide adequate information also fails.  First,
20  the EA describes the population data in adequate detail and
21  explains that the aerial inventory was done by direct counting.
22  AR 15472-74.  In addition, there is no evidence suggesting that
23  the population data obtained through direct counting was
24  inaccurate in any event.

25       Finally, it must also be emphasized that in an EA, an agency
26  is not required to include the same level of detail, and the same
27  depth of response, as for a full EIS.  See Cal. Trout v. FERC,
28  572 F.3d 1003, 1016 (9th Cir. 2009).

34

1  Under 40 C.F.R. 1508.9, an EA is defined as a "concise public

2  document.... that serves to [b]riefly provide sufficient evidence

3  and analysis for determining whether to prepare an environmental

4  impact statement of a finding of no significant impact."  An

5  agency must go farther and prepare a full EIS only "if

6  substantial questions are raised as to whether a project may

7  cause significant degradation of some human environmental factor.

8  LaFlamme v. FERC, 852 F.2d 389, 397 (9th Cir. 1988).  Here,

9  following careful consideration of the impacts of the proposed

10 action within a lengthy, 158-page EA, the BLM determined that an

11 EIS was not necessary inasmuch as the requisite "significant

12 impact" needed to trigger preparation of a full EIS was lacking.

13 That conclusion appears well-reasoned and entitled to deference

14 by this Court.

15

16                          **CONCLUSION**

17

18     Having failed to meet the high standard necessary to

19 demonstrate that the BLM's actions, both in preparing the EA for

20 the 2010 Twin Peaks Gather and in conducting the gather, were

21 arbitrary and capricious either with respect to the Wild Free-

22 Roaming Horse and Burro Act or the National Environmental Policy

23 Act, Plaintiffs' Motion for Summary Judgment (ECF No. 104) is

24 denied.  Summary Judgment is therefore granted with respect to

25 the cross-motions filed by the government (ECF No. 111) and

26 Defendant-Intervenor Safari Club (ECF No. 109).

27 ///

28 ///

1  The Clerk of Court is directed to enter judgment accordingly and

2  to close this file.

3       IT IS SO ORDERED.

4
   Dated: November 15, 2012

5

6

7                                      _____
                                       MORRISON C. ENGLAND, JR.
8                                      UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28